# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 28, 2011 Session

## STATE OF TENNESSEE v. NICKOLUS L. JOHNSON

**Appeal from the Criminal Court for Sullivan County**
**No. S50,059      R. Jerry Beck, Judge**

**No. E2010-00172-CCA-R3-DD - Filed March 5, 2012**

A Sullivan County jury convicted the Defendant, Nickolus L. Johnson, of premeditated first degree murder, see Tenn. Code Ann. § 39-13-202(a)(1) (2006), for the shooting death of Officer Mark Vance of the Bristol Police Department. Following penalty phase proceedings, the jury found the presence of the following two aggravating circumstances: (1) that the defendant previously had been convicted of one or more felonies whose statutory elements involved the use of violence to the person; and (2) that the defendant knew or should have known when he committed the murder that the victim was a law enforcement officer engaged in the performance of his official duties. See Tenn. Code Ann. § 39-13-204(i)(2), (9) (2006). After finding that these aggravating circumstances outweighed any mitigating factors presented by the defense, the jury sentenced the Defendant to death. See Tenn. Code Ann. § 39-13-204(g)(1) (2006). In this appeal, the Defendant challenges both his conviction and accompanying death sentence. He raises the following issues for our review: (1) whether the evidence presented during the guilt phase was sufficient to support his conviction; (2) whether Tennessee's death penalty statute violates article I, section 19 of the Tennessee Constitution; (3) whether the exclusion of jurors from the jury based on their views on the death penalty violates article I, sections 6 and 19 of the Tennessee Constitution; (4) whether the trial court erred in admitting into evidence the videotape of the Defendant taken in Officer Graham's patrol car immediately following the Defendant's arrest; (5) whether the trial court erred in failing to require defense counsel to present mental health mitigation evidence despite the Defendant's objection to the presentation of such evidence; (6) whether individual and cumulative instances of prosecutorial misconduct during closing argument at the penalty phase denied the Defendant his right to a fair trial and should have resulted in the trial court declaring a mistrial; (7) whether the trial court erred in denying defense counsel's requests for special jury instructions during the penalty phase in response to the prosecutor's assertion during closing that the Defendant had failed to express remorse; (8) whether the trial court erred in denying the Defendant's oral motion for a change of venue based on the effect pretrial publicity in the case had on potential jurors; (9) whether the trial court erred in denying defense counsel's request for authorization of funds with which to hire an expert

to support the claim that pretrial publicity in the case required a change of venue in order to protect the Defendant's right to a fair trial; and (10) whether the trial court erred in denying defense counsel's request for additional peremptory challenges during jury selection. Following our review of the record, and our mandatory review of the sentence, see Tenn. Code Ann. § 39-13-206(c)(1) (2006), we affirm the judgments including the sentence of death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

James T. Bowman, Johnson City, Tennessee, and Stacy L. Street, Elizabethton, Tennessee, for the appellant, Nickolus L. Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter, and Deshea Dulany Faughn, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

On the evening of November 27, 2004, Officer Mark Vance was shot and killed by the Defendant at the Sullivan County home of the seventeen-year-old girl the Defendant had gotten pregnant only a few months prior. Officer Vance responded to the residence that evening, along with other officers, after the girl's father, W.M.,[1] placed a call to 911 about a disturbance at his home. W.M., a long-haul truck driver, placed the emergency call after receiving a call on his cell phone from his daughter, B.M., who told him that a man was at their home threatening her with a gun. Unbeknownst to W.M. prior to having received this call, B.M. engaged in consensual sex with the Defendant in the late summer of 2004 and became pregnant as a result of the encounter. After learning of the pregnancy from B.M., the Defendant pressed B.M. to get an abortion. B.M. refused. On the night of the murder, B.M. and the Defendant argued on the telephone about the pregnancy because the Defendant still wanted B.M. to get an abortion. After their argument on the telephone ended, the Defendant arrived at B.M.'s residence with two guns. The Defendant's concern that evening was that

---

[1]In order to conceal the identity of the seventeen-year-old child victim of the Defendant's uncharged sexual offense, the court will adhere to its policy of referring to her only by her initials, B.M. The court will also refer to B.M.'s father by his initials, W.M., and will refer to B.M.'s twin sister by her initials, T.M.

W.M. would have the Defendant arrested for statutory rape upon learning of B.M.'s pregnancy. Almost immediately upon entering the residence that night in response to the 911 call placed by W.M., Officer Vance was shot in the face by the Defendant at close range. The remaining officers on the scene, including Lieutenant Eric Senter and Officer Daniel Graham of the Bristol Police Department, attempted to provide medical assistance to Officer Vance, who died from his injuries en route to the hospital.

*I. Evidence Presented at Trial*

Michael James Callahan, the custodian of records for the 911 call center in Bristol, Tennessee, testified as the State's first witness at trial. Through him, the jury heard the 911 call that was placed by W.M. on the night of November 27, 2004, and the resulting dispatch of officers to 427 Belmont Drive, Bristol, Tennessee. The relevant portions of the 911 call played for the jury were as follows:

| | |
|---|---|
| W.M.: | [C]ould you get an officer over to 427 Belmont Drive? My daughter says some guy is over there threatening her with a gun. |
| DISPATCHER: | Did she call you? |
| W.M.: | Yeah, she called me and said some guy was there. Apparently my daughter is pregnant by this guy. So I just left the house. I drive for J. B. Hunt, right. I just left the house to get ready to go to work. I'm stopped here in a rest area to call my company. |
| DISPATCHER: | Uh-huh. |
| W.M.: | And my daughter called and said he was there threatening her with a gun. |
| DISPATCHER: | Okay. Why didn't she call the police? |
| W.M.: | I don't know. |
| . . . . | |
| DISPATCHER: | Okay. What's your daughter's name? |
| W.M.: | [B.M.] |
| . . . . | |
| DISPATCHER: | Okay. Who's her ex-boyfriend? What's his name? |
| W.M.: | Ma'am, I don't know nothing about this ordeal. |
| DISPATCHER: | You don't? Okay. So you don't know his name? |
| W.M.: | No, I don't know his name. My other daughter told me the guy is married. |
| DISPATCHER: | Okay. |
| W.M.: | But apparently he's got my daughter pregnant again. I |

don't know what the facts are. . . .

DISPATCHER: Did she say anything else about what kind of gun it was or just a gun?

W.M.: No, no, she just told me he was over there threatening her with a gun. Now I just got on the road to go back to work.

DISPATCHER: Okay. So you don't know if he's in a car or anything and you don't--

W.M.: No, I don't —

DISPATCHER: You can't tell me what he looks like either?

W.M.: No, I can't tell you what he looks like, ma'am, because I ain't home. I'm sitting here in a rest area in my J. B. Hunt truck.

DISPATCHER: Okay. How old is your daughter?

W.M.: She's seventeen (17).

DISPATCHER: Seventeen (17).

W.M.: Yeah.

DISPATCHER: Okay. All right. Officers are already on their way over there to check on her. Okay?

W.M.: Okay.

DISPATCHER: All right.

W.M.: There's some other girls at the house. Her girlfriend was there and my other daughter, [T.M.], is there.

The relevant portions of the resulting dispatch of officers to the residence, their report of shots fired and request for a rescue unit, as heard by the jury, were as follows:

DISPATCHER: Central 438.

OFFICER VANCE: 438.

DISPATCHER: Can you start toward 427 Belmont Drive, 427 Belmont. I have a third party caller advising there's a female there being threatened with a firearm.

. . . .

DISPATCHER: Central 430.

OFFICER GRAHAM: Okay.

DISPATCHER: All units are 10-6. Can you start that way to back?

OFFICER GRAHAM: 10-4. 427 Belmont?

DISPATCHER: 10-4. It's third party. I had a male caller advising

-4-

| | his daughter contacted him advising the ex-boyfriend is there with a firearm. |
| OFFICER GRAHAM: | Central, I'll go that way. |
| DISPATCHER: | 10-4. |

. . . .

| OFFICER VANCE: | 10-97. Appears to be about six, seven vehicles at the residence. |
| DISPATCHER: | 10-4. |
| OFFICER VANCE: | I'll be out. |

. . . .

| OFFICER VANCE: | Who called this in, male or female? |
| DISPATCHER: | Their father called it in, [W.M.]. |
| OFFICER VANCE: | 10-4. And from not at the residence. |
| DISPATCHER: | 10-4. He advised he just had left. |
| OFFICER SENTER: | I've heard gunshots, gunshots. Get us four units, get us four units. 427, shots fired. |
| DISPATCHER: | Central is directing, leaving station. |

. . . .

| OFFICER SENTER: | Central, need a rescue unit. |
| DISPATCHER: | 10-4. |
| OFFICER SENTER: | Get us a rescue unit. Get us a rescue unit. Get us a detective. Man down. Officer down. |
| DISPATCHER: | 10-4, copy. |
| OFFICER SENTER: | Central, we need an ambulance here right now. |

Callahan testified that the events taking place during the quoted dispatch recording took ten minutes and five seconds to transpire. The dispatch tape began at 9:22 p.m. on November 27, 2004. Officer Senter's last quoted dispatch from the scene occurred at approximately 9:30 p.m. on November 27, 2004.

W.M. testified that he was sixty years old and resided at 427 Belmont Drive in the city of Bristol which is located in Sullivan County, Tennessee. His twin seventeen-year-old daughters, B.M. and T.M., live with him at the residence, along with B.M.'s one-year-old son. W.M. is employed as a long distance truck driver. He was home for Thanksgiving week in November of 2004. On the evening of Saturday, November 27, 2004, he was scheduled to leave to pick up a load of freight in Red Boiling Springs, Tennessee. He left his home that night at approximately 8:15 p.m. after calling Mrs. Brown, the woman he hired to stay with his daughters when he went out of town for work. W.M. testified that he thought Mrs. Brown would get to the house before he left, but she did not and he had to leave to get

on the road. When he left, his daughters and grandson were in the house along with two other girls, Aisha Clark and Addie Vereen, who were friends with his daughters. W.M. called Mrs. Brown as he was leaving the residence and she advised that she was leaving for his house in just a few minutes.

W.M. testified he was in his truck that evening at a rest stop checking messages on the onboard computer when he received a call on his cell phone from his daughter, B.M. After speaking with his daughter, W.M. called 911 and told the operator that there was a man at his home threatening his daughter with a gun. W.M. then called his employer, told them he had a serious situation in his home that meant he could not continue with the trip they had planned for him, and obtained permission to return to his house.

W.M. testified that, prior to his phone conversation with his daughter that night, he thought that B.M. might be pregnant; however, he did not have any idea who the father might be. W.M. explained that the father of B.M.'s one-year-old son was not the Defendant. On the evening of November 27, 2004, W.M. did not know the Defendant and had never seen him or heard his name before.

W.M. testified that he called home several times before he arrived back at the residence. During his last call to the residence, while he was speaking to B.M., he heard a gunshot, then screaming and hollering and then the phone went dead. At that point, W.M. "just knew that [his] daughter was shot" and drove in a confused daze the rest of the way home. He received a phone call on the way from his friend, Ted Cox, who told him that there had been a shooting at the residence. W.M. told Cox that he knew there had been a shooting and arranged for Cox to meet him at the Belmont Bowling Lanes where he was going to leave his truck. W.M.'s immediate concern upon arriving home was whether his family was safe. He testified that he was not allowed in the residence when he got there. After he had been there about forty-five minutes, an officer told W.M. that his daughters were safe and informed him about what had happened to one of the officers.

On cross-examination, W.M. admitted that one of his daughters told him during one of the calls he made to the house on his way back home that night that the man threatening them with the gun left the residence before the police arrived. W.M. further testified on cross-examination that he said as much to police that evening when they took his statement.

Eric Senter testified that on the night of November 27, 2004, he was employed as a patrol lieutenant on the night shift with the Bristol Police Department. He had been Officer Vance's supervisor for about a year and a half. Senter explained that a dispatch went out that night around 9:20 p.m. directing Officers Vance and Graham to proceed to 427 Belmont Drive in Bristol, Tennessee. In accordance with departmental policy on calls involving guns,

-6-

Senter, as the shift lieutenant, arrived as backup to the address about two or three minutes after hearing the first dispatch. Officer Vance, who was also on duty that night, was the first officer to arrive at the residence and was there when Senter arrived. Officer Graham was not yet on the scene. Officer Vance's patrol unit was parked on the street one house down from the residence. As Senter pulled up, he saw Officer Vance enter the residence. Senter parked his cruiser directly behind that of Officer Vance.

Senter testified that, as he approached the house, he could see through the front door that the house had a split-level foyer with steps on the left that led downstairs and steps to the right that led upstairs. As he was approaching the front door, Senter saw an arm extend from left to right holding what appeared to be "an old Western revolver-type gun" fire a shot from left to right. Senter was about twenty to twenty-five feet from the front door when he saw and heard the shot and about thirty-five feet from the gun itself. After the shot, Senter retreated about fifteen to twenty-five feet to a location behind a tree in the front yard, drew his weapon, and radioed into dispatch that shots had been fired and to send more units. Senter stated that it was dark outside, but there was lighting on inside the house. It had been raining earlier and the ground was wet.

Senter testified that a black male wearing a pinkish-purple shirt came out of the residence followed by another black male wearing dark clothes. Senter pointed his weapon at both subjects and told them both to get on the ground, which they did. Senter identified the second male in the dark clothes as the Defendant. A female came out of the residence next holding a gun between her finger and her thumb saying, "Why'd you shoot him? Why'd you shoot him?" Senter pointed his gun at the female and told her to drop the gun and get on the ground, which she did. At that point, Officer Graham arrived on the scene. Senter told Officer Graham to cover him as he handcuffed the two men and the woman.

As Senter placed handcuffs on the man in the dark clothes, who he identified at trial as the Defendant, Senter asked the Defendant what was going on inside the house. The Defendant responded: "I shot the fucker." Senter asked the Defendant, "Who did you shoot?" The Defendant responded: "I shot the fucking cop. I shot him in the head. He's dead. There ain't no need in going in there. The fucker's dead." At which point, the Defendant laughed. Senter asked the Defendant why he shot him. The Defendant stated that he didn't call the police and he didn't want the police up there. Senter testified that the Defendant laughed a couple more times and kept making comments like, "No need in going in there because the fucker's dead." After the Defendant identified Vance as the shooting victim, Senter called into dispatch for a rescue unit.

Senter testified that, at that point, it was "chaos inside" and that he could still hear screaming coming from inside the house. Senter told Officer Mark Smalling, who was then

on the scene, to cover the males handcuffed in the front yard while he and Officer Caudill, another officer who had arrived after the shooting, secured the residence. Senter testified that the female subject in the yard already had gotten up and ran leaving the gun she carried out behind. However, Senter instructed an officer to go get her and bring her back.

When Senter reached the top of the stairs after entering the residence, he saw Officer Vance lying in the hallway with a bleeding wound to his head. Senter also saw Officer's Vance flashlight near his body. Senter observed a small handgun resembling a Derringer near the couch in the living room that was different than the weapon he observed fire the shot earlier. The house was secured. Three additional black females were found inside the residence. These three females were placed in a cruiser while the officers finished securing the scene and tried to obtain medical treatment for Officer Vance.

Through Senter, the State introduced a series of photographs depicting how the exterior of the house looked on the night of November 27, 2004, and a series of photographs depicting how the inside of the house looked that evening immediately after the shooting. Senter described for the jury from the photographs where he was in relation to the front door when he saw the arm extend and fire the single shot that killed Officer Vance as well as the relative distance from which he observed the shot. Senter also described for the jury from the photographs the layout of the hallway at the top of the stairs with the living room to the right and the bedrooms to the left, including the blood stains and pool of blood that were the result of the injuries sustained by Officer Vance and where the Derringer handgun was found in the living room.

Officer Daniel Edward Graham testified that he had been an officer with the Bristol Police Department for the past five years. He was on duty on night of November 27, 2004. Sometime after 9:00 p.m. that night, he heard a dispatch go out directing Officer Vance to proceed as the primary responding officer to 427 Belmont Drive in Bristol, Tennessee. Officer Graham was dispatched to the same location as a backup unit. Officer Graham was at the police station when he received the dispatch and it took him approximately six minutes to reach the given address. He did not proceed to the scene with his blue lights or sirens activated. He was about a minute from the residence when he heard Officer Vance tell the dispatcher that he was at the residence and getting out of his vehicle. Officer Graham was wearing his police radio on his shoulder as part of his uniform that night, as were Officer Vance and Lieutenant Senter.

Officer Graham was on Belmont Drive but not yet to the residence when he heard Officer Vance ask dispatch who had made the 911 call. As he was pulling up in front of the residence and putting his patrol unit in park, Officer Graham heard Lieutenant Senter's radio transmission regarding a shot or shots having been fired. Officer Graham observed that

Officer Vance's cruiser and Lieutenant Senter's cruiser were already on the scene. Officer Graham also observed Lieutenant Senter walking up to the door prior to hearing the shots fired transmission. As soon as he heard that shots had been fired, Officer Graham immediately got out of his cruiser and assumed a position of cover behind the engine block of a car that was parked directly in front of the residence. He then observed Lieutenant Senter running toward his position to the left of the house.

Officer Graham described in his testimony what happened next:

> A few moments went by. A male wearing a pink shirt came out of the house. Lt. Senter was to my left and I heard him telling the gentleman to get down on the ground. He complied.
> A lady — a young female came out. She had something in her hand and I heard him say, "Put the gun down." She had it down to her side so she — she never did point it at anyone. She immediately followed his instructions, laid the weapon down, and got down on the ground as well.
> There was a third gentleman that come out. Would have been Mr. Johnson. He too was told to get down on the ground, and he — he laid down.

Officer Graham explained that the grass and sidewalk in and upon which all three individuals laid down was wet because it had rained not long before. Officer Graham provided cover for Lieutenant Senter as he handcuffed the Defendant. The female was yelling, "Why did you shoot him?" At that point, Lieutenant Senter directed Officer Graham to go into the house and check on Officer Vance. On cross-examination, Officer Graham testified that he did not hear any words exchanged between Lieutenant Senter and the Defendant while the Defendant was being handcuffed. However, on redirect, Officer Graham described the scene that night as very chaotic and hectic.

Officer Graham entered the residence with Reserve Officer Kistner. Officer Graham briefly looked downstairs, saw nothing, heard people yelling upstairs, and proceeded up to the main floor of the house. He saw a female standing in the kitchen at the top of the steps yelling and screaming. He instructed her to get down on the ground and she did. When asked by Officer Graham who had been shot, the female pointed down the hallway toward the living room. Officer Graham told the female not to move, continued the rest of the way up the steps, turned down the hallway to his right and saw Officer Vance lying on the floor at the corner of the hallway and the living room. Officer Vance had been shot on the right side of his face. His service revolver was still in his holster and he was wearing a bulletproof vest. Officer Vance's flashlight was still in his right hand, which would have been his "gun hand" because he was right-handed. Officer Graham instructed Reserve Officer Kistner to keep an eye on the female while he (Officer Graham) went outside to retrieve his medical

bag.

Upon exiting the residence, Officer Graham told Lieutenant Senter that Officer Vance had been shot and that the male wearing the pink shirt, who had not been handcuffed yet, should be placed in handcuffs. As Officer Graham proceeded toward his patrol unit, he saw a revolver lying on the ground. Officer Graham secured the revolver in the trunk of his vehicle after advising Lieutenant Senter that he was going to do so. When placing the revolver in the trunk of his cruiser, Officer Graham opened the cylinder and laid it on the trunk floor without emptying any of the cartridges. Officer Graham then identified the revolver he placed into his trunk that night and it was introduced into evidence.

After re-entering the residence with his medical bag, Officer Graham got out a trauma dressing and placed it over Officer Vance's head wound. Officer Graham was joined by Officers Greene and Tate, who are paramedics, and they began administering CPR to Officer Vance. Officer Graham explained in his testimony that one of the photographs introduced into evidence showing Officer Vance's flashlight on the carpet was taken after the flashlight had been removed from his hand and his gunbelt taken off so that CPR could be administered.

Officer Graham testified that when he went out to his cruiser at one point to retrieve oxygen for Officer Vance, he saw Officer Bradley Tate and Officer Tina Kesterson escorting the Defendant toward Officer Graham's cruiser. Then, after the ambulance arrived for Officer Vance, Officer Graham went out to his vehicle again. When he initially arrived on the scene, Officer Graham left the engine and radio of his vehicle running. His cruiser is equipped with a video camera capable of recording with audio. However, the camera for this device faces forward and records what is visible through the windshield of the cruiser. It cannot make a video recording of anything occurring in the backseat of the cruiser. Officer Graham explained that he can activate the video equipment inside the cruiser from a remote on his gunbelt. He stated that the video equipment was off when he first arrived on the scene and remained off until he came out of the residence the third time. At that point, he remote activated the video equipment inside his cruiser when he saw the Defendant appearing to be yelling something.

Officer Bradley Michael Tate testified that he had been an officer with the Bristol Police Department for just over three years. He currently is a detective, but on the night of November 27, 2004, he was a patrol officer. That night, he received a dispatch directing him to respond to 427 Belmont Drive in Bristol, Tennessee. By the time he arrived at the residence, there already were three patrol units there and Lieutenant Senter had two males on the ground in front of the residence, one of whom was the Defendant. Officer Tate immediately saw a female run out the front door of the residence screaming with a baby in

-10-

her arms. He ran after her, took her into custody and placed her in the back of one of the patrol units. At the direction of Lieutenant Senter, Officer Tate then escorted the Defendant, who was by then in handcuffs, to Officer Graham's patrol unit where he was placed in the back seat with the doors locked. The Defendant was laughing as Officer Tate took him to the vehicle. Officer Tate left Sergeant Smalling in charge of monitoring the Defendant while he was in the back of the patrol unit. Sgt. Smalling and several other officers were on the scene in the front yard at that point.

Officer Tate testified that he then went into the residence and proceeded to the top of the steps where he observed other officers administering basic life support to Officer Vance. Because he is a paramedic, Officer Tate assisted the other officers in trying to stabilize Officer Vance. Before assisting the other officers, Officer Tate observed that there were two females laying prone in the kitchen area at the top of the stairs. Officer Tate observed that Officer Vance had a traumatic injury to the right upper head area. The other officers were administering bag oxygen, but advised Officer Tate that Officer Vance had no pulse. Officer Tate advised the others to remove Officer Vance's vest and belt and start doing CPR compressions. Officer Vance was in full cardiac arrest, not breathing and with no pulse. When the ambulance arrived, Officer Tate assisted in taking Officer Vance down the steps and continued to administer life support to Officer Vance during his transport in the ambulance. Officer Tate managed to get Officer Vance's pulse back for about three minutes in the ambulance before Officer Vance died en route to the hospital.

B.M. testified that on November 27, 2004, she was seventeen years old and lived at 427 Belmont Drive in Bristol with her father and her twin sister, T.M., as well as her one-year-old son. B.M. testified that she had been introduced to the Defendant by her friend, Termaine McMorris, during the summer approximately four months prior to the shooting giving rise to this case. There had been a gathering of friends at her home when her father was not there and McMorris brought the Defendant with him. B.M. testified that McMorris was twenty years old at the time and the Defendant was twenty-six years old.

B.M. testified that on the night she first met the Defendant, she told him that she was seventeen years old and had a child. The Defendant also told B.M. that he had just had a child with his current girlfriend and that he already had a child with one of his former girlfriends. The Defendant got B.M.'s phone number and called her the next day. They spoke on the telephone a few times and had sex at her house about three and half weeks after they first met. After that, the Defendant and B.M. spoke to each other regularly and the Defendant would come over to B.M.'s house about every other night when her father was not home.

B.M. testified that between two to three months prior to November 27, 2004, she took

a home pregnancy test and found out that she was pregnant by the Defendant. B.M. immediately told the Defendant that she was pregnant and his reaction was, "Oh, no." The Defendant told her that he did not want another baby and could not handle it because he was already taking care of his other children. The Defendant asked B.M. to have an abortion and B.M. agreed to do so. The Defendant even had one of his friends drive B.M. to a clinic to have the abortion, but B.M. changed her mind and led the Defendant's friend to believe that she had the procedure before he drove her home. B.M. stated that she kept the money for the procedure, presumably given to her by the Defendant, and told the Defendant that she was no longer pregnant.

B.M. testified that communication between her and the Defendant decreased after the Defendant believed she had the abortion. However, the Defendant did tell her during one conversation that he was moving to Charlotte, North Carolina. She did not want the Defendant to leave because she knew she was still pregnant. B.M. testified that at some point before November 27, 2004, a friend of hers told the Defendant that B.M. was still pregnant. According to B.M., the Defendant was not mad when he first found out that she did not have the abortion.

B.M. testified that on the night of November 27, 2004, she was at home with her sister, her one-year-old son and her friends, Aisha Clark and Addie Vareen. Her father left the house around 8:00 or 8:30 p.m. to go on a trucking run for work. About fifteen to twenty minutes after her father left, B.M. called the Defendant on the telephone to discuss with him her pregnancy and the fact that B.M. did not have an abortion. B.M. stated that she wanted to "kind of get things straight with him." B.M. stated that she and the Defendant were not arguing on the phone at first. However, B.M. stated that she kept telling the Defendant that she did not want to have an abortion. She testified that they got into a bad fight during the conversation as a result of her refusal to have an abortion. B.M. described the Defendant as having been as mad as she had ever heard him on the phone that night. She stated that he had never lost his temper in front of her before that night. She further stated that before that night, B.M. had never heard the Defendant raise his voice.

B.M. testified that while she was talking to the Defendant on the telephone, her sister, T.M., came home, picked up the phone and began listening in on the conversation. B.M. was aware that T.M. was listening in on the call. After she hung up the phone with Defendant, B.M. next saw him when he came to the house about ten minutes later. B.M. stated that she did not know the Defendant was going to come over and that he just walked into the house when he arrived. B.M. stated that Vareen tried to stop the Defendant from coming in the door by locking it, but she was unsuccessful. The Defendant immediately started "yelling and cussing" at B.M. and pacing back and forth.

B.M. testified that the Defendant had two guns with him in his jacket pockets. She did not see the guns until the Defendant walked up the steps and into the living room where he sat them on the coffee table. B.M. described the guns as "a silver piece" and "a big black gun" wrapped in a white cloth. The Defendant told B.M. that he was going to "shoot [her] daddy" because he thought B.M.'s father would press charges against him for getting B.M. pregnant. However, B.M. admitted that the Defendant was angry with her and that his fight was with her alone. The Defendant never threatened anyone else in the house that evening.

B.M. testified that she called her father at that point and told her father that she was pregnant and that the man who got her pregnant was there at the house threatening her with a gun. B.M. did not give her father the name of the man with the gun. Her father told her that he was calling the police and turning around to come back home. After she hung up the phone, B.M. told the Defendant that the police were coming. The Defendant said he did not care. The Defendant and B.M. continued to fight. The Defendant stated, "The police can't dodge these shells." In other words, the Defendant announced that he would shoot the police if they showed up. The Defendant told B.M. that if he went to jail that night, it would be for murder not for statutory rape. B.M. was frightened because the Defendant said he was going to kill her too. However, she admitted on cross-examination that the Defendant did not threaten her over the phone. B.M. described the Defendant as being "[j]ust in a rage."

B.M. testified that she and the Defendant then heard a car drive by at which point the Defendant "pointed the gun out the window." As he did so, he said, "There's the police." However, it was not the police. Instead, it was Termaine McMorris. The Defendant had been at the house only about ten to fifteen minutes at that point. McMorris, B.M. and T.M. then attempted to calm the Defendant down and get him to leave without success. When another car pulled up in front of the house, B.M. and the Defendant were in B.M.'s bedroom that has a window that looks out to the front of the house. She testified that she had gone into that room to check on her baby who was sleeping there. When they heard the car, the Defendant looked out that window and said, "There's the police."

B.M. testified that she saw the officer come to the front door from her bedroom. B.M. left the bedroom and was standing in the hallway to the left of the stairs when T.M. and McMorris went to the door to meet the officer. B.M. heard the officer ask what was wrong. She also heard T.M. and McMorris tell the officer that everything was okay. The officer said he still needed to come in and just check things out. The officer then proceeded up the stairs with T.M. and McMorris in front of him. As the officer reached the top of the stairs, the telephone rang in the kitchen and B.M. answered it. She was standing in the kitchen talking on the phone with her father when she heard a gunshot. She did not hear any words exchanged between the officer and the Defendant, who was also standing in the hallway, prior to the gunshot. B.M. dropped the phone when she heard the gunshot and ran into her

-13-

room. She did not see who shot Officer Vance. She grabbed her baby and jumped into the closet. She came out about five to six minutes later at which point she ran out of the house with her baby. She was apprehended by an officer and placed in the back of a police cruiser. She testified that she saw Officer Vance laying on the floor to the right of the stairs just inside the living room. B.M. testified that she never saw the Defendant pick the guns up off the living room coffee table after he laid them down.

T.M. testified that on November 27, 2004, she was living at 427 Belmont Drive in Bristol with her father and her twin sister, B.M., as well as B.M.'s one-year-old son. She testified that two of her friends, Addie Vereen and Aisha Clark, were there at the house with her on the night in question. T.M. testified that she, Vereen and Clark had been riding around in T.M.'s car earlier that afternoon and they were all going to spend the night together at T.M.'s house. T.M. stated that when she and the other girls arrived back at her house around 8:15 or 8:30 p.m., T.M.'s father was outside getting his truck ready for work. When Mitchell left for work, T.M. and the other girls were all in the kitchen of the house.

T.M. testified that, at some point that evening after her father left for work, B.M. called the Defendant and T.M. overheard them talking on the phone. While B.M. was on the phone with the Defendant, T.M. and the other girls left in T.M.'s car to go buy chips and drinks at the Quick Stop near the house. When they got back to the house, T.M. could hear B.M. still on the phone yelling at the Defendant. T.M. walked down to the basement, picked up a phone down there to listen in on the conversation, and heard the Defendant and B.M. obviously having a fight about B.M. being pregnant. T.M. heard the Defendant "saying over and over and over" that he thought the girls' father was going to "press charges" against him for getting B.M. pregnant. B.M. kept assuring the Defendant during the conversation that her father was not going to "press charges" against the Defendant for the pregnancy. T.M. also heard B.M. and the Defendant discussing the subject of abortion.

After B.M. hung up the phone, T.M. called the Defendant back in an effort to calm him down. T.M. told the Defendant that her father did not even know that B.M. was pregnant so he wasn't going to press charges against him. The Defendant stated that "he was going to shoot [the girls'] daddy" if he pressed charges against the Defendant for the pregnancy. The Defendant also told T.M. "he wasn't playing games" and that he wanted to talk to B.M. again. T.M. could hear the anger in the Defendant's voice and described the Defendant as having been mad at B.M. T.M. gave B.M. the phone and B.M. hung it up without saying a word to the Defendant.

According to T.M., the Defendant showed up about ten or fifteen minutes later and entered the house. T.M. stated that Vereen ran downstairs to try to lock the door to keep the Defendant from entering the house, but did not get to the door in time. The Defendant did

not say anything when he walked in the door. He just laid two guns on the living room table and stated that he was going to "kill" both B.M. and the girls' father. One of the guns was "[a] big long gun" that was black and the other gun was silver and smaller. The bigger gun was wrapped in a white cloth. The Defendant later picked up the guns, put them in his pocket and continued to fight with B.M. about the pregnancy and his concern about being charged for it. T.M. stated that the Defendant did not threaten her, Vereen or Clark at that point because his fight was with B.M. The Defendant paced up and down the hallway while he and B.M. continued to yell at one another.

T.M. testified that, before the Defendant arrived at the residence, B.M. called their father because the Defendant told B.M. to make the call and tell her father to come home. According to T.M., the Defendant told B.M. to tell her father to come home because the Defendant wanted to talk to him. After B.M.'s conversation with her father, there was discussion about the police coming to the residence. T.M. testified that the Defendant made the following statement with regard to the police coming to the house: "[W]hoever walks through the door will be the first to die I guess." T.M. further testified that the Defendant made the statement that if he was going to go to the penitentiary, it was going to be for murder and not for statutory rape.

After B.M. got off the phone with her father, a mutual friend of both T.M.'s and the Defendant's, Termaine McMorris, arrived at the residence and attempted to get the Defendant to leave. The Defendant refused to leave the residence. T.M. asked McMorris to try to calm the Defendant down. McMorris tried to do this, but the Defendant just wanted everyone to leave him and B.M. alone and let them fight it out. While McMorris was there, the Defendant looked outside and pointed one of his guns out the window.

T.M. testified that a short time later she saw Officer Vance pull up in his police cruiser outside the residence. B.M. and the Defendant were in B.M.'s bedroom and everyone else was in the living room. T.M. and McMorris went down the stairs to meet Officer Vance at the front door. As they were walking down the stairs, McMorris told T.M. to tell Officer Vance that everything was okay. T.M. and McMorris met Officer Vance outside the front door on the porch. The front door was open, but the glass outer door was shut. Officer Vance was in uniform and talking to someone on his dispatch radio. When they got to Officer Vance, T.M. told him that everything was okay. McMorris said nothing. Officer Vance stated that he had to go into the house to see if everything was okay.

T.M. and McMorris then entered the house ahead of Officer Vance and walked up the steps toward the kitchen. McMorris was the first up the steps followed by T.M. and Officer Vance. His weapon was not drawn. When she was halfway up the steps, T.M. told Officer Vance that "he has a gun." Officer Vance asked her, "Who?" T.M. responded, "him," but

T.M. does not think Officer Vance could see the Defendant at that point. Officer Vance talked on his dispatch radio as they ascended the stairs. T.M. testified that Officer Vance may have been using his left hand to activate the radio on his right shoulder.

When they reached the top of the steps, T.M. and McMorris turned left down a hallway toward the bedrooms. They walked down the hallway to a point behind where the Defendant was standing at the top and to the left of the steps near the entrance to the kitchen. Officer Vance reached the top of the steps and was standing a little past the kitchen entrance to the right when he was shot in the forehead by the Defendant. T.M. and McMorris were standing close enough to the Defendant that they could have reached out and touched him. The big long, black gun used by the Defendant to shoot Officer Vance was about one to two feet from the officer when it discharged. No words were exchanged between Officer Vance and the Defendant before the Defendant fired the gun.

T.M. testified that Officer Vance fell to the ground and the Defendant stated: "I'm out." The Defendant then threw the smaller of the two guns "in towards the living room" and placed the long, black gun he used to shoot Officer Vance at the bottom of the stairs as he walked outside. McMorris went out the front door of the residence ahead of the Defendant. T.M. followed the Defendant outside the residence and picked the gun up at the bottom of the steps on her way out. She does not know why she picked up the gun. As she walked out the door, she asked the Defendant why he did it. The Defendant did not answer.

T.M. testified that the police told her to drop the weapon and lay down on the ground as soon as she got outside. She did so, but then got back up and ran back into the house to the kitchen. When officers entered the residence, T.M. was once again ordered to lay down and was taken into custody. T.M. estimated that it only took about three to four minutes from the time Officer Vance arrived at the house until she walked out of the residence with the gun in her hand.

On cross-examination, T.M. testified that both she and B.M. knew the Defendant for about four or five months prior to the shooting. She stated that both she and B.M. met the Defendant at a party at their house. McMorris brought the Defendant to the party. T.M. stated that she had known McMorris at that point for two years. T.M. testified that prior to the shooting, the Defendant came over to her house to see B.M. on about a weekly basis since the two of them met.

Aisha Clark testified that she was at the residence located at 427 Belmont Drive in Bristol on the night of November 27, 2004, and witnessed the Defendant kill Officer Vance. Clark testified that earlier that afternoon, T.M. picked her up and the two of them with Addie Vereen went riding around in T.M.'s car. She stated that they arrived at the Belmont Drive

residence before dark but after her friends' father left to go to work. She estimated that it was somewhere around 8:15 or 8:30 p.m. and that she and her friends were riding around for about two or three hours before that. The only two people at the residence were B.M. and her infant son. B.M. was on the phone with the Defendant when Clark arrived at the residence.

Clark testified that her plan that night had been to spend the night at the residence with the twins, B.M. and T.M. Clark stated that the Defendant, who she had known "for years," showed up at the residence around 10:00 p.m. However, she conceded that she was not wearing a watch and did not specifically look at a clock when he arrived. She stated that she was sitting on the couch and the Defendant just walked through the front door. Clark testified that she recalls Vereen going to the door to lock it or shut it; however, it is unclear from the testimony whether that was before or after the Defendant entered the residence. On cross-examination, Clark admitted that she told the police in the statement she gave the morning after the shooting that Vereen tried to shut the door while the Defendant forced his way in.

Clark testified that the Defendant was mad and began loudly arguing with B.M., but she did not recall what the argument was about. She stated that the Defendant came into the living room and "slammed" two guns down on the table, with the bigger of the two guns being wrapped in a cloth. Clark stated that the Defendant never threatened her and that his anger was directed only at B.M. Clark stated that the Defendant was walking up and down the hallway while arguing with B.M, who just kept calmly asking the Defendant to leave.

At some point, someone told the Defendant the police were on their way, to which the Defendant responded that he was not going to leave and that nobody could make him leave. When asked what the Defendant said would happen when the police got there, Clark testified that the Defendant said "[e]ither [B.M.'s] dad or the police officer, whoever got there first, he was going to shoot in the face." Clark also testified that she heard the Defendant say that if he was going to the penitentiary, it would be for murder and not statutory rape.

Clark testified that at some point that night McMorris, who she had also known "for years," showed up at the residence. Clark testified that McMorris calmly tried to get the Defendant to leave the residence, but that the Defendant told McMorris to "back up" because "he ha[d] his finger on the trigger." Clark testified that the Defendant was mad when he said this, but "said it calmly." Clark stated that McMorris and the Defendant were also friends.

Clark stated that the police arrived about three or four minutes after McMorris. T.M. and McMorris walked to the front door, at which point Clark walked into B.M.'s bedroom. Clark testified that she did this to check on B.M.'s infant son and Vereen who were both in

-17-

that bedroom at the time. Clark never saw Officer Vance walk up the stairs after he entered the residence. She did hear Officer Vance talking as he came up the stairs, but she does not recall what he was saying. She stepped out into the hallway and saw Officer Vance walking into the living room. Officer Vance "was standing about four or five feet away from [Clark], and [the Defendant was] standing about a foot away from him." Both of their backs were turned toward Clark. She saw Officer Vance talking into his walkie-talkie. She saw that he had one hand on the walkie-talkie and nothing in the other hand. Clark saw the Defendant's arm go up in an upward motion and heard gunshots, at which point she saw Officer Vance fall. T.M. and McMorris were standing in front of Clark and between Clark and the Defendant when Clark heard the gun fire. Clark did not know where B.M. was in the house at the moment. Clark testified that no words were exchanged between the Defendant and Officer Vance prior to the gunshot and Officer Vance had made no threats toward the Defendant.

Clark testified that after shooting Officer Vance, the Defendant "just sat the guns down and walked outside." Clark recalls McMorris walking outside after the Defendant, but did not see anything that went on outside after that. Clark testified that she was scared for her own safety at the time. She stated that everything happened very quickly and that people were screaming after the Defendant shot Officer Vance. Clark testified that she ran into the kitchen where the police found her about five minutes later. The police told everybody to get down on the ground before taking them into custody for questioning.

Special Agent Brian Pritchard of the Tennessee Bureau of Investigation ("TBI") testified that he took charge of the investigation surrounding the shooting death of Officer Vance at approximately 11:15 p.m. on the evening of November 27, 2004. He described it as having "been raining substantially" with "drizzly rain off and on" when he arrived. He also described the grass in the front yard of the residence as very wet. Agent Pritchard testified that the Defendant was already in custody when he arrived. He was arrested and handcuffed at approximately 9:30 p.m.

As part of his investigation, Agent Pritchard testified that he took custody of the .357 single-action, magnum revolver that Officer Graham locked in the trunk of his car. Agent Pritchard checked the weapon and determined that it was loaded. The gun holds six rounds and there were still five live rounds in the weapon. The hammer to the weapon was positioned directly over a spent round. Agent Pritchard identified both the spent round and the live rounds retrieved from the weapon, all of which were introduced into evidence. Agent Pritchard testified that he also received into evidence that night a .22 caliber single-action, five-shot revolver resembling a Derringer pistol. This gun was found in a holster and contained five live rounds that Agent Pritchard removed from the weapon. The live rounds retrieved from this weapon were introduced into evidence along with the pistol from which

they came and the holster.

Agent Pritchard further testified that he received into evidence that night and during the course of his investigation various other items of evidence including: the flashlight Officer Vance was carrying that night; the black, longsleeve windbreaker jacket worn by the Defendant; some bullet fragments retrieved from the head of Officer Vance during the autopsy; a blood sample from Officer Vance taken by Dr. McCormick during the autopsy; gunshot residue test kits from testing performed at the scene on the Defendant, McMorris, B.M., T.M., Clark and Vereen; fingerprint samples taken from the Defendant; and a swab from a blood stain on a picture that was hanging on the wall of the living room of the residence. Agent Pritchard stated that he performed the gunshot residue test on the Defendant and other officers performed the tests on the other people at the scene. He stated that he did not perform the gunshot residue test on the Defendant until sometime between 1:10 and 1:15 a.m. on November 28, 2004, after the Defendant already was in custody at the Sullivan County Sheriff's Department. He also did not take the Defendant's jacket into evidence until sometime between 1:45 and 2:00 a.m. on November 28, 2004, after the Defendant was in custody at the jail.

Agent Pritchard testified that he sent all of the evidence he collected during the investigation to the TBI crime lab in Nashville for processing. He stated that he asked the crime lab to determine whether there was gunshot residue in any of the test kits or on the jacket retrieved from the Defendant. He also asked the crime lab to determine whether there were any fingerprints on the .357 revolver or the rounds retrieved from that weapon that belonged to the Defendant. Agent Pritchard further directed the crime lab to determine whether the swab of blood retrieved from the scene matched Officer Vance's blood sample and whether the bullet fragments retrieved from Officer Vance's body were fired from the .357 revolver. On cross-examination, Agent Pritchard conceded that if there were no gunshot residue analysis results for T.M. it would mean that either her test kit was inadvertently not delivered to the TBI crime lab for analysis or his directive for another officer to obtain a gunshot residue test sample from her was not communicated properly.

Agent Pritchard was also shown the same series of photographs introduced into evidence during Senter's testimony and confirmed that the photographs depicted how both the exterior and interior of the residence looked on night of November 27, 2004. During this part of his testimony, Agent Pritchard confirmed from the photographs that the top of the steps inside the house could be seen by someone standing on the front porch. Agent Pritchard also testified with the aid of the photographs as to the distances he measured in the front yard from the curb to the walkway leading up to the house and from where the driveway meets the road to the front door. He stated that the first distance was between thirty-six and forty feet and the second distance was a little over 51 feet. Agent Pritchard also described

-19-

from the photographs, as well as a diagram of the interior of the house, the layout of the hallway at the top of the stairs with the living room to the right and the bedrooms to the left, including where the blood stains from Officer Vance's injuries were found, where the swab of blood from the picture was taken, and where the .22 caliber pistol and flashlight were found. Agent Pritchard further described from the photographs that the bedroom identified as belonging to B.M. had a window from which the front yard and street could be seen.

Agent Pritchard also testified that he received into evidence that night and during the course of the investigation the original VHS videotape recording from Officer Graham's police cruiser as well as two DVD digital recordings of what appeared on the tape. These items were introduced into evidence during Agent Pritchard's testimony. Agent Pritchard stated that the tape lasted approximately two hours with extended periods of silence or just the radio playing in the background.[2] He explained that the Defendant could be heard making statements on the tape at various points. Agent Pritchard then identified a transcript as representing the first thirteen minutes and thirty-eight seconds of the tape. The transcript was introduced into evidence as well. The portion of the tape covered by the transcript was played for the jury and the Defendant can be heard on the tape verbally posturing about his lack of remorse for having shot Officer Vance and total apathy about the consequences of his actions. Specifically, the Defendant can be heard laughing while saying,

> Listen, I'm all right. Am I alive or dead, cop? It ain't nothing but a — it ain't nothing but clean sheets or maybe the electric chair. I'll be all right. . . . That don't scare me. You can — you can do it right now. It don't scare me, cop. You're a bitch if you don't do it. . . . Yeah, I'm all right alive or dead, free or alive. . . . It's all a game to me, man. This ain't nothing to me, man. . . . Lay down sweet, lay down easy, go do my time and I'll go to the chair if I got to. She don't mean nothing to me, man. . . . Take me for life. Take me to the chair if you want to. Life ain't sweet.

The Defendant also can be heard laughing while saying,

> They don't teach you that in training, do they? . . . Yeah, you weren't ready for that. You weren't ready for that in training. . . . Don't take me for no joke, man. . . . It don't feel good, do it? That's how it feels when you took him away for life, don't it? I said that's how it feels when you take my fucking jail — take their life away from somebody. That's how it feels.

---

[2]The parties stipulated that any music playing during the tape came from the radio in the police cruiser that was left on by Officer Graham. The jury was instructed not to have any bias or prejudice against the Defendant as a result of the lyrics that can be heard on the videotape coming from the radio in the vehicle.

Agent Pritchard confirmed during his testimony that officers and EMS personnel can be seen walking around outside the police cruiser during the tape. He stated that he arrived on the scene near the end of the videotape recording and that after conducting some preliminary interviews he directed that the Defendant be transported from the scene to the Sullivan County Sheriff's Department. On cross-examination, the remainder of the tape not covered by the transcript, which mostly contains long periods of silence, was played for the benefit of the jury at defense counsel's request.

TBI Special Agent Laura Hodge, who has worked at the Nashville crime lab for the past fourteen years, testified as to her credentials and was accepted without objection as an expert in the field of gunshot residue analysis. Agent Hodge explained that in analyzing gunshot residue test kits she looks for the presence of antimony, barium and lead which are the three elements that make up the primer composition of a bullet cartridge. She stated that Agent Pritchard submitted gunshot residue test kits for analysis from various subjects including the Defendant, McMorris, B.M., Clark and Vereen. Agent Hodge testified that her analysis of the test kit from the Defendant was inconclusive in that the results could not eliminate nor confirm the possibility that the Defendant fired, handled or was near a gun when it fired. Agent Hodge explained that her analysis of the Defendant's test kit found the presence of the three elements indicative of primer from a cartridge, but the amounts were insufficient to make a definitive conclusion with regard to the presence of gunshot residue. In contrast, her analysis of the test kits from B.M., Clark and Vereen were negative for the presence of any of the three elements indicative of primer from a cartridge. However, she conceded that it is possible for an individual to fire a weapon and have no gunshot residue present on their person. She explained that gunshot residue "is very fragile evidence" that can be impacted by many environmental factors including if the individual from whom the evidence was taken had lain in wet grass before the sample was taken, if there were only one shot fired, or if the subject had rubbed his or her hands onto something prior to the sample having been taken. Agent Hodge could not perform an analysis of the test kit submitted for McMorris because it was missing a key component necessary to conduct the analysis. She also never received a gunshot residue test kit for analysis from the subject known as T.M.

TBI Special Agent James Russell Davis, II, who has worked at the Nashville crime lab for twenty-five years, testified as to his credentials and was accepted without objection as an expert in the field of gunshot residue analysis. He explained that while Agent Hodge chemically analyzed gunshot residue test kits to determine the presence of the elements within the primer of a bullet, he used an electron microscope to examine items of clothing and other things looking for the presence of the metallic particles of those elements in combination found in the primer discharge when a gun is fired. Agent Davis testified that he received for gunshot residue analysis from Agent Pritchard a jacket obtained from the Defendant. Agent Davis explained that his analysis of the Defendant's jacket did not reveal

the presence of particles of gunshot primer residue. However, Agent Davis made clear that the results of his analysis neither eliminated nor confirmed that the Defendant fired a gun while wearing the jacket. Agent Davis testified that many things could happen to a garment between the firing of a weapon in its proximity and his analysis of the garment for gunshot residue that would impact his ability to achieve conclusive results regarding the presence of gunshot residue. Specifically, Agent Davis stated that his ability to achieve meaningful results in his analysis could have been impacted by the Defendant laying down in what appeared to be the wet grass shown in the photographs of the front of the residence taken on the night of the shooting.

On cross-examination, Agent Davis admitted that he did not analyze the back of the jacket even though gunshot residue can transfer from a sleeve to the back of a jacket if the subject wearing the jacket is being handcuffed. He also testified that no other articles of clothing from the Defendant or any other subject were submitted for him to analyze.

TBI Special Agent Hoyt Eugene Phillips, who has worked at the Nashville crime lab for thirty-two years, testified as to his credentials and was accepted without objection as an expert in the field of latent fingerprint analysis. Agent Phillips testified that he received for latent fingerprint analysis from Agent Pritchard the .357 magnum revolver and cartridges taken into evidence by Officer Graham at the scene of the shooting. Agent Phillips explained the methods he uses to obtain latent fingerprints for analysis and testified that he was unable to find any useable prints on any of the items submitted to him for analysis. Agent Hoyt stated that many factors could have contributed to the lack of any latent fingerprints being found on the weapon or cartridges and that the lack of such prints did not rule out the possibility that a particular individual handled the weapon or cartridges.

TBI Special Agent Charles S. Hardy, who has worked at the Nashville crime lab for seven years, testified as to his credentials and was accepted without objection as an expert in the field of DNA analysis. Agent Hardy testified that he received for DNA analysis from Agent Pritchard several swabs taken at the crime scene of evidence believed to be blood stains. He explained the methods he uses to determine whether a specific sample contains a DNA profile and then how he analyzes that profile once obtained. He was able to extract a DNA profile from a swab identified as being taken from a blood stain on a picture in the living room of the residence and matched that DNA profile to a known DNA sample from Officer Vance.

TBI Special Agent Steve Scott, who has worked at the Nashville crime lab for almost twenty-one years, testified as to his credentials and was accepted without objection as an expert in the field of firearms identification. Agent Scott testified that he received for comparison analysis from Agent Pritchard the .357 magnum revolver, a fired cartridge casing

taken from the crime scene, and fired bullet fragments obtained during the autopsy of Officer Vance. Agent Scott determined the weapon was in normal operating condition with properly functioning safety features. His analysis of the weapon showed that once loaded, the hammer of the weapon had to be pulled back "to a full-cock position" before it would fire for each shot. Agent Scott explained that the trigger pull for this weapon was approximately two and a half pounds, or, in other words, that it takes two and a half pounds of pressure on the trigger to discharge the weapon. His analysis of the fired cartridge casing and the fired bullet fragments revealed that they were all fired from the .357 magnum revolver submitted with them for analysis. Agent Scott also testified that he created with the .357 magnum revolver various test fire patterns at differing distances to be sent to the medical examiner, Dr. William McCormick, for comparison with the wounds found on the body of Officer Vance.

Lieutenant Joseph Herman Strickler of the Sullivan County Sheriff's Office testified that he is familiar with the telephone system available to inmates at the jail facility, that all calls made by inmates at the facility are recorded, that he is the custodian of record for the recordings of telephone calls made by inmates, and that he had listened to recordings of certain telephone calls made by the Defendant and others while incarcerated at the jail facility. During his testimony, Strickler provided a diagram of the "Kilo Cell Block" in which the Defendant was housed during his incarceration at the jail. Strickler explained that inmates in that cellblock are kept in individual cells. They are allowed out of their cells for only one hour each day to use the telephone, shower or exercise. Utilizing the diagram, which was admitted into evidence, Strickler explained that the individual cell in which the Defendant was housed was approximately thirteen feet from the telephone available to inmates in that cellblock. Strickler also explained that an inmate named Dustin Ferguson was housed in the same cell block during the Defendant's incarceration.

Strickler explained that jail logs for the Defendant's cellblock, which were introduced into evidence, showed that on December 6, 2004, the Defendant was released from his cell at 9:11 a.m. and returned to his cell at 10:11 a.m. The jail logs also showed that inmate Ferguson was released from his cell on the same date at 10:15 a.m. and returned to his cell at 11:16 a.m. The recordings of inmate telephone calls made on that date include a call made by the Defendant at 10:07 a.m. and another call made by inmate Ferguson at 10:14 a.m., both of which were to the same telephone number identified as belonging to Niki Booker, the Defendant's sister. The recordings of inmate telephone calls made on December 7, 2004, include two telephone calls made by the Defendant to Booker in which McMorris can also be heard speaking. Strickler explained that it appeared that Booker called McMorris during the initial call from the Defendant and initiated a three-way call. The recordings of all four telephone calls and transcripts of the calls were introduced into evidence and the tapes were played for the jury.

During the first call between the Defendant and Booker on December 6, 2004, the following exchange can be heard on the tape:

DEFENDANT: Yeah. Yeah, but Termaine need to tell 'em what's up.

BOOKER: Huh?

DEFENDANT: Termaine, how'd they get ahold of him? What, did Termaine, lie to them people like a couple of times?

BOOKER: He what?

DEFENDANT: When they, when they questioned him, what did he lie to 'em? Mama said he lied to 'em?

BOOKER: Oh, he said, that's what he was sayin', I didn't really hear the whole thing because I was so upset I left the room.

DEFENDANT: All right.

BOOKER: But he was sayin' —

DEFENDANT: Hurry up so it won't —

BOOKER: Okay, he said that he was tryin' to say that you didn't do it and then you had already told 'em that you did and they was gonna try to charge him with accessory.

DEFENDANT: All right, they, they, they're comin' to get me right now.

BOOKER: Okay.

During the second call, which was made by inmate Ferguson on December 6, 2004, a male voice can be heard identifying himself to the telephone operator as "Nick Johnson" and the following exchange can be heard on the tape:

MALE: Okay, Nick's lawyer is supposed to call Termaine.

BOOKER: Okay.

MALE: He said his lawyer is the only person that knows what's goin' on.

BOOKER: Okay.

MALE: Is that okay? He said talk to Termaine.

BOOKER: Okay.

MALE: But he —

BOOKER: Okay.

MALE: Okay, he said don't let these people fool you into thinkin' nothin'.

BOOKER: Okay.

MALE: Fool Termaine into thinkin' nothin'.

BOOKER: Okay.

-24-

| | |
|---|---|
| MALE: | He said that, he say he explained to his lawyer.[3] |
| BOOKER: | What happened? |
| MALE: | He say yeah. |
| BOOKER: | Okay. |
| MALE: | He, he said when, when he pulls for his — |
| BOOKER: | Huh? |
| MALE: | His exact words were when he pulled for his — |
| BOOKER: | Uh-huh. |
| MALE: | That's what he said. |
| BOOKER: | Okay. |
| MALE: | All right. He said do you understand what he's sayin'? |
| BOOKER: | Yeah. |
| MALE: | She said yeah. Okay, she said — he said make sure. |
| BOOKER: | Okay. He said — yeah. |
| MALE: | He said call Termaine on Tomeka's phone. |
| BOOKER: | Okay. |
| MALE: | What else, [inaudible]? Okay, he, he — okay, he said to call Termaine and make sure that, uh, he's sayin' the same thing that he — he don't, he don't have to be scared to talk to his lawyer. Is that okay? |
| BOOKER: | Okay. |
| MALE: | He said if anything, don't let these — don't believe anything these people say. |
| BOOKER: | I'm not. |
| MALE: | He said, he say he could trust his lawyer. |
| BOOKER: | Okay. |
| MALE: | He said call on Tomeka phone. |
| BOOKER: | I will. |
| MALE: | And make sure that he knows everything is all right. |
| BOOKER: | I will. |
| MALE: | And he says, that, uh, make sure he doesn't lie to his lawyer. |
| BOOKER: | Okay. |
| MALE: | She said okay. He said make sure that when he talk to people or ever he pulled for his that's what happened. |
| BOOKER: | Okay. |
| MALE: | She said okay. He say he ain't got to lie, just tell 'em the |

---

[3]When this conversation took place, the Defendant had not yet had his preliminary hearing and was still represented by the Office of the Public Defender.

|         |                                                                                 |
|---------|---------------------------------------------------------------------------------|
|         | truth.                                                                           |
| BOOKER: | Okay.                                                                            |
| MALE:   | She said okay. He said don't leave out no parts.                                 |
| BOOKER: | Okay.                                                                            |
| MALE:   | And tell Termaine not to leave out no parts.                                     |
| BOOKER: | Okay.                                                                            |
| MALE:   | To his lawyer and be honest with him.                                            |
| BOOKER: | Okay.                                                                            |
| MALE:   | Okay, and he said explain to the lawyer how the whole thing went down and how they was tryin' to push him out the house and everything. |
| BOOKER: | Okay.                                                                            |
| MALE:   | She said okay. All right, he say he loves you and thank you.                     |
| BOOKER: | Okay. Thank you for letting me use your call.                                    |
| MALE:   | Okay. Okay.                                                                      |
| BOOKER: | All right.                                                                       |
| MALE:   | Do you have everything understood, to understand me?                             |
| BOOKER: | Yeah, he said to call Termaine and tell him that he needs to talk to his lawyer and tell him to tell the truth, the whole story and explain to 'em how he was, they was tryin' to push him out of the house and when he pulled for his that's when it happened and, uh, — |
| MALE:   | She said she's got it now. All right, he said he loves you.                      |
| BOOKER: | I love you — tell him I love him too.                                            |
| MALE:   | He said do you have Tomeka's number?                                             |
| BOOKER: | Yeah.                                                                            |
| MALE:   | She said yes. He said make sure you get this done because this is real important. |
| BOOKER: | I am, I'll call now.                                                             |
| MALE:   | He said go ahead and call his lawyer because he's tryin' to get ahold of you too. |
| BOOKER: | Okay.                                                                            |
| MALE:   | And Termaine to get ahold of — he said talk to Termaine first before you call the lawyer. |
| BOOKER: | Okay.                                                                            |
| MALE:   | He said just tell Termaine don't be nervous, now just, the best, the best thing is to tell the truth right now so his lawyer will know what's goin' on. |
| BOOKER: | Okay.                                                                            |

| | |
|---|---|
| MALE: | He said just the lawyer, don't talk to nobody else. |
| BOOKER: | Okay. |
| MALE: | And he said make sure that he, that he, um, implicates that — make sure that he know, that his lawyer knows that — |
| BOOKER: | Okay. |
| MALE: | That the dude pulled first. |
| BOOKER: | Okay. |
| MALE: | Okay, he said that's it. |

During the entirety of this conversation, a muffled voice can be heard in the background speaking to the male caller before the male caller makes his statements to Booker.

During the first call made by the Defendant on December 7, 2004, the following conversation can be heard on the tape:

| | |
|---|---|
| BOOKER: | . . . I talked to Termaine. |
| DEFENDANT: | What'd he say? |
| BOOKER: | He was sayin' that — I told him that you, what you had said and he was like he's not mad at me?  I was like why would he be mad — |
| DEFENDANT: | Why would I be mad? |
| BOOKER: | That's what I said, why would you be mad, he said "I'm scared and stuff."  I was like, well, Termaine — |
| DEFENDANT: | He must have read a statement or somethin'. |
| BOOKER: | Probably. |
| DEFENDANT: | Yeah. |
| BOOKER: | But I told him to talk to your lawyer and then you lawyer called me. |
| DEFENDANT: | Huh? |
| BOOKER: | Your lawyer called me. |
| DEFENDANT: | He did call you? |
| BOOKER: | Yeah, and — |
| DEFENDANT: | He probably got — did he, do you know if he got ahold of Termaine? |
| BOOKER: | He hadn't at that point but he had called right after — |
| DEFENDANT: | Try to call Termaine real quick. |
| . . . . | |
| DEFENDANT: | Yeah.  He think I'm mad.  He must have a real messed up statement or somethin'. |

BOOKER:         I don't know, he said "Like he's not mad at me."  I was like, no, he's not mad.

DEFENDANT:      Answer the phone.  Answer the phone.  Answer the phone.

MCMORRIS:       Hello.

DEFENDANT:      Hello, who's this?

BOOKER:         Termaine.

DEFENDANT:      Termaine?

MCMORRIS:       Who's this?

DEFENDANT:      This is Nick.  Who's this?

MCMORRIS:       This is Termaine.

. . . .

DEFENDANT:      . . . My lawyer ever get ahold of you?

MCMORRIS:       Oh, he called.  I called him back but he wasn't in his office.

DEFENDANT:      You still ain't talked to him then?

MCMORRIS:       No.

DEFENDANT:      Try to get ahold of him, all right?

MCMORRIS:       I will.

DEFENDANT:      Niki talked to you already?

MCMORRIS:       Huh?

DEFENDANT:      Niki talk to you already?

MCMORRIS:       Yeah.

DEFENDANT:      I can't say too much over this phone, all right?

MCMORRIS:       Yeah.

DEFENDANT:      Uh, they, they get you to write a statement down there?

MCMORRIS:       Huh?  Uh, they got, they took everybody's statement about what happened.

DEFENDANT:      Yeah.  Does everything look bad?

MCMORRIS:       Huh?

DEFENDANT:      Everything look bad?

MCMORRIS:       If I was you I'd have blamed it on Tiff cause she's the one that came out the house with the gun.

DEFENDANT:      Huh?

MCMORRIS:       She the one that came out the house with the gun.

DEFENDANT:      Don't, don't talk too much on the phone.  Don't, you know, don't, don't talk too much over the phone.

MCMORRIS:       All right.

DEFENDANT:      You know what I'm sayin', all these phone calls gonna be recorded.

-28-

| | |
|---|---|
| MCMORRIS: | All right. |
| DEFENDANT: | But, uh, like I say, everything is all right, man. Like I say, talk to my lawyer man, don't, don't talk to noth — don't let them fool you into sayin' anything else as far as a statement, all right. |
| MCMORRIS: | All right. |
| . . . . | |
| DEFENDANT: | They can't, they can't, they can't make you say nothin'. |
| MCMORRIS: | Uh-huh. |
| DEFENDANT: | You see what I'm sayin'. Like I say, talk to my lawyer. You can trust my lawyer. Don't, don't trust the State man, they gonna try to trick you up, man. |

During the second call made by the Defendant on December 7, 2004, almost immediately after the conclusion of the first, the following conversation can be heard on the tape:

| | |
|---|---|
| DEFENDANT: | . . . Yeah, you know that one. Yeah, they can't, they can't make you testify, man. |
| MCMORRIS: | I'm not, I'm pleading the Fifth. |
| DEFENDANT: | Yeah. |
| MCMORRIS: | They can't do nothin' but be mad. |
| . . . . | |
| MCMORRIS: | You play your, you play your cards right you can beat that. |
| DEFENDANT: | What you say? |
| MCMORRIS: | You play your cards right you can beat that. |
| DEFENDANT: | Like I said, you just tell my lawyer, tell my lawyer what happened. Like I said, you know what I'm sayin'? I don't want to say too much over this phone, you know what I'm sayin', because I know it's probably gonna be recorded. |
| . . . . | |
| MCMORRIS: | I'm, uh, talk, I'm gonna keep tryin' to get in touch with your lawyer. |
| DEFENDANT: | Right. |
| MCMORRIS: | If them cards is played right you can beat that. You can beat that, no bull shit. |
| DEFENDANT: | Like I say — |
| MCMORRIS: | Now what — what I — if I get — they put me up there |

-29-

|   |   |
|---|---|
| | and I get up I just say I plead the Fifth they ain't nothin' they can do to me, can they? |
| DEFENDANT: | No, you ain't, you ain't got to do nothin'. But like I say, what you say can help too, you know what I'm sayin'? |
| MCMORRIS: | Yeah. |

Dustin Ferguson testified that he was incarcerated in the Sullivan County Jail on December 6, 2004, in what is known as the "Kilo Cell Block." Ferguson stated that he met the Defendant while incarcerated in that cell block. Ferguson testified that on December 6, 2004, when he was released from his individual cell for his one hour of personal time, the Defendant asked him to call a particular number for him. Ferguson agreed and the Defendant gave Ferguson the number to call. When the person on the other end of the line answered the telephone, the Defendant told Ferguson what to say during the conversation. Ferguson repeated during the conversation what the Defendant told him to say. The tape of the second telephone conversation made on December 6, 2004, and already played for the jury, was then played for Ferguson who identified himself as the caller. Ferguson stated that he had no idea who he was talking to during the conversation. Ferguson was released from the jail eleven days after making the call for the Defendant. Ferguson testified that has been in trouble before and that he has been convicted of felony identity theft as well as theft of services. He also admitted that he had charges pending against him for aggravated assault, possession of a Schedule III drug, and possession of a Schedule IV drug for resale. However, Ferguson testified that he had not been promised any leniency on his pending charges in exchange for his testimony.

Dr. William Frederick McCormick, M.D., the Deputy Chief Medical Examiner for the State of Tennessee, testified as the State's last witness. He performed the autopsy on Officer Mark Vance to determine the cause and manner of his death. Defense counsel did not object to Dr. McCormick being accepted by the trial court as an expert in the field of forensic pathology. Dr. McCormick testified that Officer Vance died "as a result of a single intermediate range gunshot wound to the face, with the entrance slightly above the right eye about the level of the mid-eyebrow with destruction of the skull, [and] damage to the brain." Dr. McCormick further testified that the cause of Officer Vance's death was "[m]assive damage to the head including soft tissues, [the] skull, and brain," with "aspiration of blood" and "inhaling [of] blood." Dr. McCormick explained, using diagrams prepared during the autopsy, that the spread of stippling burns on Officer Vance's face resulting from the impact on the skin of unburned powder from the muzzle of the weapon was only eleven centimeters or between four and five inches. Dr. McCormick testified that this meant the gun was fired between one and two feet away from Officer Vance's face. Dr. McCormick stated that the test fire patterns given to him for comparison by the TBI, even though damaged somewhat upon receipt, were consistent with this distance estimate based upon the stippling pattern.

-30-

Dr. McCormick also testified that his distance estimate based on the stippling was consistent with the weapon having been a .357 caliber firearm.

Dr. McCormick testified that the bullet that killed Officer Vance entered his head at a sharp angle traveling downward, very slightly from his right to his left, and exited the skull near the lower jawbone with bullet fragments lodging in the upper neck. This meant Officer Vance was facing the gun that was positioned slightly above him at a distance of between one to two feet. Dr. McCormick testified that the contents of Exhibit 57, previously introduced into evidence for identification only, were the bullet fragments he removed from the brain tissue of Officer Vance during the autopsy. Dr. McCormick testified that the bullet that killed Officer Vance caused "massive fracturing" of and "virtually destroyed" the base of the skull. Dr. McCormick opined that Officer Vance survived only a matter of minutes after the bullet traveled through his skull, but that he was alive long enough to inhale blood from his wounds. Dr. McCormick opined that Officer Vance would have been rendered unconscious almost immediately upon receiving the fatal gunshot wound.

After the State rested its case, the Defendant presented no defense witnesses. The jury found the Defendant guilty of first degree premeditated murder as charged in the indictment.

*II. Evidence Presented at Sentencing*

The State began its proof at the sentencing phase by introducing certified copies of an indictment and conviction order establishing that the Defendant was convicted on June 19, 1997, pursuant to a written guilty plea, in the City of Bristol in the Commonwealth of Virginia of the offense of malicious wounding. The indictment to which the Defendant pled in the Virginia case alleged that, on or about November 19, 1996, the Defendant "did maliciously cause bodily injury to Johnny C. Chafin, Jr., with intent to maim, disfigure, disable or kill, in violation of Virginia Code Section 18.2-51." The State also introduced testimony from TBI Agent Pritchard establishing that the Defendant is the same person referenced in the paperwork establishing this conviction.

The State concluded its sentencing phase proof with testimony from Captain Timothy Eads of the Criminal Investigations Division of the Bristol Police Department establishing that on November 27, 2004, Officer Mark Vance was a sworn police officer in uniform performing his official duties when he responded to the dispatch at the residence where he was killed. Captain Eads also testified that Officer Vance was thirty years old at the time of his death and was survived his mother, his brother, his wife and his nine-year-old daughter.

The Defendant presented his twin sister, Niki Booker, as his first witness at sentencing. Booker and the Defendant were born in Chicago, Illinois, and lived there with

their mother until they were two or three years old, at which point they moved to Bristol, Virginia. They never knew their birth father. Booker and the Defendant have two older sisters and an older brother. She stated that they all grew up together in Bristol.

Booker testified that she is married with four children. The Defendant has lived with her on numerous occasions and was present at the births of three of her children. She explained that the Defendant was always "a role model" to her children, "always in a positive aspect," and "continues to keep joy in [her] home." Booker stated that the Defendant was the uncle that her children needed him to be and that she loves the Defendant very much. She explained that her children always expressed love for the Defendant and that she brought them to see him while he had been in jail in this case as much as she could. Booker described the Defendant as always having "a positive demeanor." She stated that he tried to pass that quality on to her children. Booker then described and showed to the jury various colored pencil drawings from her family album that the Defendant sent to her children as gifts while he was incarcerated for the malicious wounding conviction previously introduced into evidence by the State. Booker finally described the special bond she has with the Defendant as his twin and how devastating it would be for her if he were executed.

On cross-examination, the State established that Booker was the same person heard on the taped phone calls from the Defendant heard earlier by the jury during the guilt phase. On redirect, defense counsel clarified with Booker that the Defendant called her from the jail and that she was not present at the scene the night Officer Vance was killed. Booker admitted though that she called the number the Defendant asked her to during the taped phone conversation.

The next witness presented by the defense was Dr. Latisha Sensabaugh Walker,[4] the Defendant's cousin. Dr. Walker grew up with the Defendant in the same neighborhood when they were kids and she considered him to be like an older brother. She explained that the Defendant often acted as her protector growing up, making sure she stayed out of trouble and stayed away from the wrong type of crowd. She described the Defendant as one of her biggest supporters in terms of staying in school, keeping her grades up and making sure she got a good education. She described the Defendant as being "very artistic" and shared with the jury a card he drew for her when she was seventeen years old and away at school in New Orleans. After she completed school and was working as an intern at a local pharmacy, the Defendant would often come in and check on her to make sure she had lunch and gasoline for her car. When her home was broken into when she was in pharmacy school, the Defendant was the first person she called for help. The Defendant also was the first person

_____

[4]Dr. Walker received her Doctor of Pharmacy degree from the University of Tennessee before moving to West Tennessee where she works as a pharmacist.

to make arrangements to get her home and make sure she had money to get home after the break in. Dr. Walker stated that the Defendant's primary focus during his incarceration on this charge was not himself and his situation, but whether she was doing well and whether her husband was treating her well. She concluded by stating that she felt that the Defendant receiving a death sentence would not allow her to give back to the Defendant all that he had given to her up to that point.

The Defendant's next witness, Patty Aiello, testified that she had lived in Bristol, Virginia for thirteen years and had known the Defendant since high school. She described the Defendant as "a good guy," "somebody that is fun to have around," a person whose "always been the life of everything," a person who "smiles everywhere he goes," and "somebody that is always there for you." She stated that she believed the Defendant was "a good guy in general" and that he "treat[ed] everybody with respect and very nicely." However, she admitted that she knew the Defendant was found guilty as a juvenile in 1996 of concealing merchandise and that he was convicted as an adult in 1997 of possession of cocaine with the intent to distribute, burglary and the offense of malicious wounding that the State was using to support one of the aggravating circumstances in this case.[5] On cross-examination, she explained that she knew the victim involved in the malicious wounding case and that the incident giving rise to that conviction "was a childish fight." Aiello also testified during her direct examination that she is good friends with Amanda Fields, that the Defendant and Fields were also friends, and that she had witnessed herself how kind and generous the Defendant always had been toward both Fields and Fields' daughter from a failed relationship with another man. Aiello told the jury that she had been able to continue her relationship with the Defendant since he had been incarcerated and wished to continue to do so.

The Defendant's next witness, Amanda Fields, testified that she had lived in Bristol, Virginia her entire life and had known the Defendant since 1991 when she was eleven years old. Both she and her nine-year-old daughter considered the Defendant and his family as if they were a part of her own family. She described the Defendant as being "like a brother." Fields' daughter's father had been "in and out of her life" since their daughter was born and her daughter considers the Defendant like a stepfather. Fields explained that the Defendant took it upon himself to be "a positive father figure" to her daughter. The Defendant always remembered her daughter's birthday and regularly talked to the child on the phone before his incarceration. Fields stated that she felt it was important that her daughter had the Defendant

_____

[5]The jury was instructed to consider the specific instances of criminal conduct utilized by the State during its cross-examination of Aiello only in terms of evaluating the credibility of Aiello, not as substantive evidence of the Defendant's character.

in her life as a father figure. Fields believed that the Defendant had made a valuable contribution to her daughter's well-being.

On cross-examination, the State established that there were periods of time in Fields' daughter's life when the Defendant was absent and unable to see her. However, Fields testified that during those prior absences the Defendant talked to her daughter on the phone and kept up with her life through pictures. Fields also stated that while the Defendant was incarcerated for this offense he spoke with her daughter on the phone a few times. She admitted that her daughter had not visited the Defendant at the jail. Fields also stated that the Defendant continued to be the kind of father figure she wanted for her daughter despite the events that gave rise to this case.

Mitzi Rebecca Young testified that she lived in Bristol, Virginia and had known the Defendant since she was eleven years old. She testified that the Defendant had "loaned" her $1,000.00 to be used toward the down payment on her house, but refused to allow her to pay him back when she had the money to do so. She also explained how the Defendant helped her mother pay her bills when her mother got laid off and also helped her mother with yard work and things around her house. Young described the Defendant as "very generous" and "a good friend" to her and her family.

Reverend Willis A. Johnson, the pastor of the Bay Street Baptist Church in Bristol, Tennessee, testified that the Defendant attended the church regularly with his family since he was about three or four years old. Rev. Johnson further testified that one of the Defendant's sons attended the daycare center at the church. Rev. Johnson described the Defendant's son as "the greatest little guy you ever want to see" and expressed concern about the child's ability "somewhere in his lifetime to have some kind of relationship, if he wanted to, with his daddy." Rev. Johnson stated that it did not matter whether the Defendant was incarcerated for that relationship to be beneficial because a "[f]ather is a father."

Natasha Michelle Pender testified that she and the Defendant have a two-year-old son together. Pender described and shared with the jury various enlarged photographs of the Defendant with their son.[6] Pender admitted that her son's contact with the Defendant was limited because her son was born in September of 2004, only three months before the shooting giving rise to this case. However, she stated that when the Defendant was able to spend time with their son he "was real attentive" and actively assisted in taking care of the boy when he was an infant. Pender testified that the Defendant continued to write letters to their son from jail and send him drawings that Pender had framed in the boy's room. Pender explained that a death sentence for the Defendant would be devastating to both her and her

---

[6]The photographs shown to the jury were not included in the record.

son because she needs the Defendant to help her teach their son how to be a man. She clarified on cross-examination that she feels the Defendant, given his experiences in life up to that point including the shooting of Officer Vance, could help teach their son what to avoid in life.

The Defendant's next witness, Linda Sensabaugh, is the mother of Dr. Walker. She is the Defendant's second cousin and has known him all of his life. The Defendant grew up in the same neighborhood in which her family lived. The Defendant and his siblings would often spend the night at her house and her children would similarly spend the night at the Defendant's mother's house. From those experiences with the Defendant, Sensabaugh explained that the Defendant often took the blame for the misdeeds of the other children and would cry along with them if they got punished for something. She described the Defendant as a "very helpful young man" toward her daughter when she was in school, calling her when she was away at college and encouraging her to keep up with her studies. Sensabaugh also stated that the Defendant would often ask her what he could do to help make sure her daughter achieved her goal of becoming a pharmacist. She also recalled in her testimony the day her nephew got upset at his birthday party when he did not get a scooter as a gift. She explained that the Defendant went out that day "and spent his last penny to buy that child a Razor Scooter." Sensabaugh stated that the boy has looked up to the Defendant ever since.

The last witness for the defense at sentencing, Kimberly Delaney, testified that she and the Defendant have a three-year-old son together. Delaney described and shared with the jury various enlarged photographs of the Defendant with their son.[7] She also shared with the jury a photograph taken of the Defendant at the co-ed baby shower they had before their son was born, a photograph of the Defendant in a hospital room with Delaney just prior to the birth of their son, and a photograph of the Defendant and their son at his first Easter. Delaney also shared with the jury a Valentine's Day card the Defendant sent her during his pretrial incarceration telling her how much he meant to her as well as a birthday card the Defendant sent to their son for his second birthday. Delaney testified that the Defendant was "always . . . a very genuine father to [their son]" and was "always . . . very active in his life whether it was coming to pick him up, him staying with [the Defendant], you know, buying formula, diapers, money for day care." Delaney and her son visited the Defendant in jail almost every Saturday since his arrest because she felt such visits were "crucial" for her child. She testified that she believed it was important for her son to know and have a relationship with his father, even if the Defendant was incarcerated for most of his life. She stated that the effect on her son of the Defendant being executed obviously would be "very dramatic."

_____

[7]The photographs shown to the jury were not included in the record.

Following the presentation of Delaney's testimony, the defense rested its case. The jury later returned its verdict finding the presence of the two noticed statutory aggravating circumstances, finding that these aggravating circumstances outweighed the presence of any mitigating circumstances, and finding that death was the appropriate punishment.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant argues that the evidence presented by the State during the guilt phase was insufficient to support his conviction for first degree premeditated murder.[8] Specifically, the Defendant asserts that the evidence did not establish beyond a reasonable doubt that the killing of Officer Vance was premeditated. The Defendant argues that the evidence established that he was "in a state of irrational rage" when he shot Officer Vance, not that the shooting was the result of "the cool, deliberate judgment required by the element of premeditation."

The standard of review applicable to the Defendant's challenge to the sufficiency of the evidence presented during the guilt phase of this trial is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). "In making this determination, we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." Majors, 318 S.W.3d at 857; see also State v. Cole, 155 S.W.3d 885, 897 (Tenn. 2005); State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). The presumption on appeal is that the jury resolved in favor of the prosecution all issues concerning witness credibility, conflicts in the testimony, and the weight and value to be given to the evidence and drew all reasonable inferences from the evidence in favor of the State. See Majors, 318 S.W.3d at 857; Cole, 155 S.W.3d at 897; Bland, 958 S.W.2d at 659; State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because the jury's verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the Defendant bears the burden on appeal of demonstrating why the evidence is insufficient to support the verdict. See Majors, 318 S.W.3d at 857; Cole, 155 S.W.3d at 897; Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

---

[8]The Defendant presented no evidence at the guilt phase of the trial other than through cross-examination of the State's witnesses.

The Defendant was convicted of first degree premeditated murder. In order to establish that the Defendant was guilty of this offense, the State had to prove beyond a reasonable doubt that the Defendant committed a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2006). A premeditated killing is one committed "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (2006). As the statute explains,

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. Thus, premeditation simply is the process "of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). "No specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan." Id. at 543.

The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Several factors may be considered by the jury in determining the presence of premeditation, including: "use of a deadly weapon on an unarmed individual; the particular cruelty of the killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; making preparations to conceal the crime before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing." State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); see also State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); Bland, 958 S.W.2d at 660. In addition, the jury may also infer premeditation from the evidence establishing a motive for the killing. See Thacker, 164 S.W.3d at 222; Leach, 148 S.W.3d at 54; State v. Sims, 45 S.W.3d 1, 8 (Tenn. 2001); State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

The State argues that when the evidence properly is viewed in the light most favorable to the prosecution, it supports the jury's finding that the Defendant formed the intent to kill another before fatally shooting Officer Vance. As the State asserts in its brief, the evidence presented at trial established that the Defendant went to the Mitchell residence on the evening of November 27, 2004, armed with two weapons, because he was angry at B.M. for refusing to have an abortion and feared that B.M.'s father would have the Defendant arrested on statutory rape charges upon learning that the Defendant had impregnated seventeen-year-old

-37-

B.M. Upon learning that police had been called and were on their way to the residence, the Defendant was heard by three separate witnesses—B.M., T.M. and Clark—to have said that he would "shoot in the face" the first person who walked through the door of the residence, whether it was B.M.'s father or a police officer. Those same three witnesses also heard the Defendant state before the police arrived on the scene that if he was going to prison, it was going to be for murder and not for statutory rape. The evidence presented at trial demonstrates that the Defendant then executed his plan by shooting Officer Vance in the face as he entered the residence and before the officer could draw a weapon. After shooting Officer Vance, the Defendant stated, "I'm out," placed the weapon on the stairs leading to the front door, and walked out of the residence. Once outside the residence, the Defendant admitted to having shot Officer Vance and advised the other responding officers, while laughing, that Officer Vance was dead. The Defendant also attempted through phone calls from the jail to his sister to conceal the severity of his offense by instructing her to have McMorris, and then directly instructing McMorris, to tell the Defendant's attorney that Officer Vance drew his weapon first.

From all of this proof, a rational jury could have found beyond a reasonable doubt that the Defendant killed Officer Vance intentionally and with premeditation. While the evidence shows that the Defendant was agitated when he arrived at the Mitchell residence and may have even made his statements of intent about shooting an officer while in an agitated state, it was for the jury to decide whether the Defendant's level of agitation prevented him from forming the requisite intent to commit first degree premeditated murder. The jury made that determination based upon the facts presented and the evidence supports the jury's conclusion. See State v. Bullington, 532 S.W.2d 556, 559 (Tenn. 1976) (holding that if the intent to kill is formed with premeditation, it is irrelevant whether the defendant may have been in a "heat of passion" when the premeditated intent to kill was carried into effect). Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for first degree premeditated murder.

*II. Constitutionality of Tennessee's Death Penalty Statute*

The Defendant argues that the trial court erred in denying his pretrial motion to dismiss the indictment on grounds that Tennessee's death penalty statute violates article I, section 19 and other related provisions of the Tennessee Constitution.[9] Specifically, the

_____

[9]The State asserts in its brief that the Defendant also has challenged in this appeal the constitutionality of Tennessee's death penalty statute on grounds that the imposition of the death penalty is per se cruel and unusual punishment under both the Eighth Amendment of the United States Constitution and article I, section 16 of the Tennessee Constitution. However, the Defendant's brief contains no such

(continued...)

-38-

Defendant argues that the statute violates the Tennessee Constitution by mandating that a jury must impose death upon finding that the aggravating circumstances proven by the State outweigh all mitigating circumstances. The Defendant argues that the mandatory language of the statute "constitutes a legislative usurpation of the jury's duty to decide the appropriate punishment to be imposed in individual cases." The Defendant further argues that the mandatory nature of the statute also misleads the jury as to its responsibilities and duties in a capital sentencing hearing. The State contends that the trial court properly denied the pretrial motion to dismiss because the argument presented in the motion has been considered and rejected by our supreme court. We agree.

As the supreme court explained in State v. Black, 815 S.W.2d 166 (Tenn. 1991), article I, section 19 of the Tennessee Constitution "guarantees freedom of speech and of the press." Id. at 185. The last clause of the final sentence of this constitutional provision requires that "in all indictments for libel, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other criminal cases." Tenn. Const. Art. I, § 19. After analyzing the origin of this provision and its historical significance, see Black, 815 S.W.2d at 185-86, the supreme court in Black held that the last clause of the final sentence of this constitutional provision "was not meant to and does not effect the sentencing and punishment of criminal defendants." Id. at 187; see also State v. Reid, 164 S.W.3d 286, 335 (Tenn. 2005) (appendix); State v. Van Tran, 864 S.W.2d 465, 481 (Tenn. 1993). Accordingly, this issue is without merit.

*III. Constitutionality of Exclusion of Jurors Based on Views on the Death Penalty*

The Defendant argues that the trial court erred in denying his pretrial motion in which he sought to preclude the removal for cause during jury selection of any prospective jurors who expressed religious, moral or philosophical opposition to the death penalty under any circumstances. We agree with the State's position on appeal that the trial court properly rejected the Defendant's blanket constitutional challenges to the exclusion of jurors for cause whose views on the death penalty would have prevented them from discharging their duties as jurors in this capital case.

In his brief, Defendant concedes that it is permissible under the United States Constitution to exclude jurors for cause in a capital case if their views on capital punishment would prevent them from imposing the death penalty in a particular case in accordance with

_____

[9](...continued)
challenge. Even if the Defendant were raising this argument in this appeal, the State is correct that it has been considered and rejected by our supreme court many times. See State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993) (collecting cases).

the law and the facts presented. However, the Defendant argues that article I, sections 6 and 19 of the Tennessee Constitution prohibit an otherwise qualified juror from being excluded from jury service based solely on his or her opposition to the death penalty. The Defendant also argues that the supreme court in State v. Harrington, 627 S.W.2d 345 (Tenn. 1981), held that jurors should not be excluded for cause simply because they have expressed reservations about or opposition to the death penalty. The Defendant then argues, despite his initial concession to the contrary, that the exclusion of jurors based upon their opposition to the death penalty infringes upon the right to an impartial jury drawn from a fair cross-section of the community as guaranteed by Sixth and Fourteenth Amendments to the United States Constitution as well as comparable provisions in the Tennessee Constitution.

It should be noted that the Defendant's only challenge here is to the process of "death qualifying" a jury in a capital case according to the standards set forth in Witherspoon v. Illinois, 391 U.S. 510 (1968), and Wainwright v. Witt, 469 U.S. 412 (1985). The Defendant references in his brief the exclusion for cause in his case of three prospective jurors—Penny Hawk, Barbara Semones and Robert Hill—based upon their views on the death penalty. However, the Defendant does not argue that the trial court improperly applied the standards set forth in Witherspoon and Witt in excusing these particular jurors for cause. In fact, the argument presented by the defense in response to the prosecutor's motion to exclude these jurors for cause was not that these jurors could set aside their personal beliefs and be open to the possibility of the death penalty in a particular case after considering both the facts and the law as presented to them in court. Instead, defense counsel argued that "excusing jurors who have conscientious objections to the death penalty excludes otherwise qualified members of the jury pool" and "deprives the Defendant of due process and equal protection under the law." In other words, defense counsel's argument is that the process of "death qualifying" a jury is unconstitutional under both the federal and state constitutions and the cause excusals cited by counsel in support of this issue reinforce the limited scope of this issue on appeal.[10]

In Uttecht v. Brown, 551 U.S. 1 (2007), a case decided only a few months after the

_____

[10]A review of the answers given during voir dire by prospective jurors Hawk, Semones and Hill indicates that all three properly were excused for cause because they stated unequivocally that their personal beliefs prevented them from voting to impose the death penalty as punishment for a crime under any circumstances. We note that the lack of record citations in the brief to any other cause excusals of prospective jurors based upon their views on the death penalty waives any argument that prospective jurors, other than jurors Hawk, Semones and Hill, may have been excused for cause in error. See Tenn. R. App. P. 27(a)(7)(A) (requiring argument to contain "citations to the authorities *and* appropriate references to the record") (emphasis added); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, *or appropriate references to the record* will be treated as waived in this court.") (emphasis added); see also State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).

-40-

Defendant's trial, the United States Supreme Court upheld the constitutionality of the process of "death qualifying" a jury in a capital case in accordance with the standards set forth in Witherspoon and Witt. See id. at 5-9. As the Supreme Court explained in Uttecht, Witherspoon and Witt establish "at least four principles of relevance here":

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

Uttecht, 551 U.S. at 9 (internal citations to Witherspoon and Witt omitted). Our supreme court also has repeatedly rejected state and federal constitutional challenges to the process of "death qualification," including those raised by the Defendant in this case. See, e.g., State v. Reid, 91 S.W.3d 247, 289-90 (Tenn. 2002) (rejecting state constitutional challenge to removal for cause of prospective jurors who oppose the imposition of the death penalty because of "sincerely held" religious, moral or philosophical beliefs); State v. Hall, 958 S.W.2d 679, 717 (Tenn. 1997) (appendix) (rejecting claim that the manner of selecting "death qualified" jurors unconstitutionally results in juries that are prone to conviction); State v. Jones, 789 S.W.2d 545, 547 (Tenn. 1990) (rejecting claim that "death qualification" of jury violated the Sixth Amendment by depriving the defendant of a fair and impartial jury). Moreover, as the State points out in its brief, the Defendant's reliance on Harrington is misplaced as it is no longer good law for the proposition for which it was cited. See State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989) ("Harrington was decided four years before Wainwright and on the juror bias issue is no longer of precedential value."). Accordingly, this issue is without merit.

*IV. Admissibility of Videotape of Defendant*

The Defendant argues that the trial court erred in denying his pretrial motion in limine in which he sought to prevent the State from introducing into evidence at trial the videotape containing statements by the Defendant immediately after his arrest while he was seated in the back of Officer Daniel Graham's patrol unit. The Defendant argues that his statements

on the videotape were not relevant to any of the issues being tried and that, alternatively, the probative value of the statements was far outweighed by their prejudicial effect. See Tenn. R. Evid. 403.[11]

The State contends that the trial court did not abuse its discretion in admitting the videotape into evidence because the Defendant's recorded statements were relevant as both a confession and corroborative evidence of the Defendant's motive for the murder, i.e., that if he was going to be sent to prison, it would be for murder and not for statutory rape. The State argues that the statements made by the Defendant on the videotape were extremely probative of the Defendant's state of mind when he shot Officer Vance and that this probative value far outweighed any prejudicial impact the statements made have had on the jury.

It is within the trial court's discretion to determine the admissibility of photographic or videotape evidence and this court will not disturb such a decision on appeal absent a clear showing of an abuse of that discretion. See State v. Reid, 213 S.W.3d 792, 840 (Tenn. 2006) (appendix); State v. Carruthers, 35 S.W.3d 516, 576 (Tenn. 2000) (appendix); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "Of course, simply because evidence is prejudicial does not mean the evidence must be excluded as a matter of law." Carruthers, 35 S.W.3d at 577; see also Reid, 213 S.W.3d at 840. Relevant evidence need only be excluded under Rule 403 if

---

[11]We decline to consider because it has been waived the Defendant's argument that the videotape constituted improper evidence of the Defendant's bad character and therefore was inadmissible pursuant to Rule 404 of the Rules of Evidence. As the State asserts in its brief, this argument is raised for the first time in this appeal. The Defendant did not assert this argument as a basis for the inadmissibility of the videotape in either his motion in limine or his motion for new trial. It is well-settled that a defendant cannot change on appeal his or her theory regarding the inadmissibility of evidence from what was asserted as the basis for objection in the trial court. See State v. Dooley, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000). "Such action constitutes waiver of the issue." Id.

We also interpret the Defendant's appellate challenge to the statements on the videotape as being directed only at the first thirteen minutes and thirty-eight seconds of the tape introduced by the State. Defense counsel made a tatical decision during his cross-examination of Agent Pritchard to have the remainder of the videotape played for the judge pursuant to the "rule of completeness." Tenn. R. Evid. 106. As such, he may not now challenge on appeal the admission of that portion of the videotape heard by the jury only at defense counsel's request. See, e.g., State v. Jerry Breeding, No. M2001-00043-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., at Nashville, Jan. 25, 2002), perm. app. denied, (Tenn. May 6, 2002).

it has "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951.

In this case, we agree with the State that the statements from the Defendant that can be heard on the videotape made immediately after his arrest were clearly relevant and perhaps the best evidence of his state of mind at the time he shot Officer Vance. The primary issue in this case was not whether a homicide occurred or whether the Defendant committed it. Instead, the primary issue in this case was whether the Defendant formed the intent to kill Officer Vance prior to the homicide and therefore committed first degree premeditated murder. See Tenn. Code Ann. § 39-13-202(a)(1) (2006). On that crucial element, the statements by the Defendant on the videotape were very relevant.

During the videotape, the Defendant can be heard posturing about his total lack of remorse for having shot Officer Vance and apathy about the consequences of his actions. Specifically, while laughing, the Defendant makes clear that he is ambivalent about facing a death sentence for the murder of Officer Vance ("It ain't nothing but a — it ain't nothing but clean sheets or maybe the electric chair. I'll be all right. . . . That don't scare me. You can — you can do it right now. It don't scare me, cop.") and that the shooting itself was nothing but a "game" to him. The Defendant also can be heard laughing while bragging about how Officer Vance's training did not prepare him for what happened. Finally, the Defendant describes his shooting of Officer Vance as having shown the officer "how it feels when you take [someone's] life away" by sending that person to jail.

These statements made by the Defendant on the videotape can be interpreted as confirmation by him that his shooting of Officer Vance was a follow-through on the threat made to B.M. that he would "shoot in the face" the first person who walked through the door of the residence because, if he were going to be sent to prison, it would be for murder and not for statutory rape. To the extent the statements made by the Defendant on the videotape are prejudicial, it is because they are so inculpatory on the issue of intent. Most relevant evidence introduced by the State during a murder trial will be prejudicial to the defendant. Rule 403 is directed to evidence that inflames the jury or appeals improperly to the jury's emotions. The challenged videotape was prejudicial to the Defendant only because it was so probative of the Defendant's state of mind at the time he shot Officer Vance. There is nothing about the statements made by the Defendant on the videotape that would have any tendency to improperly inflame the jury or appeal to the jury's emotions in reaching a verdict. As such, the Defendant's argument that the videotape should have been excluded pursuant to Rule 403 is without merit. However, even if we were to conclude that the trial court erred in admitting the videotape into evidence, any such error would have been harmless given the strength of the testimony from other witnesses regarding the Defendant's statements of intent immediately prior to the shooting. See Tenn. R. App. P. 36(b) ("A final judgment from

which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Accordingly, this issue is without merit.

### V. Failure to Require Presentation of Mental Health Mitigation

The Defendant argues that the trial court erred in failing to direct defense counsel to present mental health mitigation during the penalty phase, despite the Defendant's objection to and affirmative waiver of the presentation of such evidence. The Defendant alternatively argues that, even if the trial court properly allowed defense counsel not to present mental health mitigation, the trial court erred in not calling as its own witnesses those mental health professionals who could have presented mental health mitigation evidence to the sentencing jury. Citing to Lockett v. Ohio, 438 U.S. 586 (1978), the Defendant asserts that consideration by a capital sentencing jury of all available mitigation evidence is constitutionally required and therefore the penalty phase of his trial should not have gone forward without the presentation of mental health mitigation notwithstanding the Defendant's objection to and waiver of the presentation of such evidence.

The State responds to this issue on appeal by arguing that the propriety of allowing a competent capital defendant to waive the presentation of mitigating evidence during the sentencing phase of a capital trial was resolved by the supreme court in Zagorski v. State, 983 S.W.2d 654 (Tenn. 1998). The State asserts that, in allowing the Defendant to waive the presentation of mental health mitigation in this case, defense counsel and the trial court complied with the requirements set forth in Zagorski regarding the acceptance of such a waiver.

In Zagorski, the supreme court held that a competent capital defendant has the right to waive the presentation of mitigating evidence during the penalty phase of his or her trial. See id. at 658-59; see also State v. Kiser, 284 S.W.3d 227, 244 (Tenn. 2009). To aid the trial courts in determining whether to permit the waiver of mitigating evidence by capital defendants in prospective cases, the supreme court in Zagorski provided the following guidelines for use when the issue of waiver of mitigating evidence arises in a capital case:

> [W]hen a defendant, against his counsel's advise, refuses to permit the investigation and presentation of mitigating evidence, counsel must inform the trial court of these circumstances on the record, outside the presence of the jury. The trial court must then take the following steps to protect the defendant's interests and to preserve a complete record:

1. Inform the defendant of his right to present mitigating evidence and make a determination on the record whether the defendant understands this right and the importance of presenting mitigating evidence in both the guilt phase and sentencing phase of trial;

2. Inquire of both the defendant and counsel whether they have discussed the importance of mitigating evidence, the risks of foregoing the use of such evidence, and the possibility that such evidence could be used to offset aggravating circumstances; and

3. After being assured the defendant understands the importance of mitigation, inquire of the defendant whether he or she desires to forego the presentation of mitigating evidence.

Zagorski, 983 S.W.2d at 660. The supreme court explained that "[t]his procedure will insure that the accused has intelligently and voluntarily made a decision to forego mitigating evidence." Id. The supreme court cautioned, however, that the trial court "shall not inquire of counsel as to the content of any known mitigating evidence" because doing so "would potentially force counsel to act against the client's wishes and would risk the disclosure of privileged or confidential information." Id. at 660-61.

It should be noted that the Defendant's argument in support of this issue appears not to be that the trial court failed to follow the requirements of Zagorski in accepting his waiver of the presentation of mental health mitigation in this case. Rather, the Defendant's argument appears to be that a competent capital defendant cannot waive the presentation of any mitigating evidence because such a waiver would be inconsistent with the constitutional requirement that a capital sentencing jury consider all available mitigating evidence before determining that death is the appropriate punishment. However, as explained in State v. Smith, 993 S.W.2d 6, 13-14 (Tenn. 1999), the supreme court in Zagorski considered and rejected the arguments advanced by the Defendant here—namely, that a competent capital defendant "may not waive the right to present mitigating proof and that such a waiver violates the heightened reliability required in death penalty cases." Nevertheless, despite the fact that the Defendant is not challenging in this issue the trial court's adherence to the requirements of Zagorski, our review of the record confirms both that the Defendant was competent and that he knowingly and voluntarily chose to waive the presentation of mental health mitigation in this case.

Prior to the presentation of any evidence at the penalty phase, and during a jury-out hearing, the State requested that defense counsel confirm whether the Defendant intended to offer expert testimony in support of mental health mitigation during the penalty phase and,

if so, that the trial court unseal the reports prepared by the mental health experts for both the State and the defense which had been submitted under seal pretrial pursuant to the dictates of Reid v. State, 981 S.W.2d 166 (Tenn. 1998). In response to the State's request, defense counsel informed the trial court that the Defendant did not wish to present any mental health mitigation at sentencing despite counsel's advice that effective representation under both state and federal precedent required them to present such evidence. In fact, defense counsel stated that the Defendant was "violently opposed" to the presentation of any mental health mitigation.

Defense counsel informed the trial court that their mental health experts had evaluated the Defendant and were prepared to testify. Defense counsel made clear to the trial court that this was not a case in which the Defendant had instructed them not to gather mental health mitigation and they had honored that wish. Instead, defense counsel explained that this was a case in which counsel had obtained and prepared expert testimony on the issue of mental health mitigation, counsel fully intended to present such testimony, counsel were being instructed by the Defendant not to present such testimony, and counsel intended to present such testimony unless instructed by the trial court to do otherwise. Discussion of the Zagorski and Smith cases then ensued with the trial court directing both defense counsel and the State to have their mental health experts available in the event the trial court required a determination from them regarding the Defendant's competence to waive the presentation of mental health mitigation.

After a short break, defense counsel presented the trial court with a written notice of their intent to present mental health evidence during sentencing. However, the trial court announced that it would withhold releasing the sealed reports to the State until the issue of the Defendant's waiver of mental health mitigation was resolved. At that point, the trial court announced that it wished for the Defendant to make a limited appearance under oath for the purpose of addressing the court concerning his desire to waive the presentation of mental health mitigation.

Upon being examined under oath by the trial court, the Defendant stated that he understood that the jury had found him guilty of first degree murder, that the State had to prove at least one aggravating factor before the jury could consider imposing either a death sentence or a sentence of life without parole, that the Defendant had the right to present any evidence in mitigation through witnesses or otherwise that he believed was relevant and that he had the right to have the jury consider mitigating evidence even if the State proved at least one aggravating factor beyond a reasonable doubt. The Defendant further stated that he understood that the jury did not have to reach a unanimous decision as to any one mitigating factor, but that each individual juror could consider any mitigating evidence he or she wished in determining the appropriate sentence. The Defendant stated that he understood that he did

not have to present evidence in mitigation to have the jury instructed that it should consider as mitigating circumstances anything of a mitigating nature that was supported by the evidence already presented. He also stated that he understood he had no obligation to testify at sentencing or ask for mercy from the jury.

The Defendant stated that he knew his attorneys had investigated all manner of potentially mitigating circumstances in his case, including obtaining evidence and witnesses who could testify as to the Defendant's mental health. He stated that he understood that his attorneys wished to put on evidence in mitigation even though he did not. He stated that he had discussed with his attorneys the risk of not putting on the mitigation evidence they wished to present and that he understood that not presenting such evidence could mean the difference between a death sentence and life imprisonment. The Defendant then unequivocally stated to the trial court stated that, despite the risks that had been made known to him of not presenting any mitigating evidence at sentencing, he did not want his attorneys to present such evidence on his behalf. The Defendant explained that he felt that the result of the sentencing was going to be the same regardless of what evidence was presented and that if it was "God's will" that he be sentenced to death then so be it. Upon further inquiry from the trial court, the Defendant clarified that he was waiving the presentation of all mitigating evidence and not just the presentation of mental health mitigation. The Defendant explained that he had no desire to "beg these people no sympathy."

The trial court then confirmed with both defense attorneys that they believed they had investigated all available mitigating evidence in this case to the best of their ability, that they had informed the Defendant of the availability of the evidence they believed was mitigating, and that they had explained to the Defendant the importance of mitigating evidence and the risks of not presenting such evidence. When asked by the trial court regarding the Defendant's competence, one of the Defendant's attorneys stated that in his opinion any Defendant who was "willing to roll over and let a jury kill him" was mentally incompetent. The Defendant's other attorney agreed and stated that "[a]nybody that would forego the opportunity to save his life is incompetent." However, both attorneys conceded that the Defendant had been examined by a psychiatrist and found to be competent to stand trial and that they had no evidence that they could tender to the court that called into question the Defendant's competence to waive the presentation of mitigating evidence.

After examining both the Defendant and his attorneys, the trial court announced that he would recess for the evening in order to allow the Defendant to further think about his decision to forego the presentation of mitigating evidence. The trial court also instructed the parties to have available the next morning any mental health experts who had evaluated the Defendant prior to trial.

When the proceedings resumed the following day, the trial court confirmed with the Defendant outside the presence of the jury that he still wished to forego the presentation of any evidence in mitigation at sentencing. At that point, defense counsel asserted that they had reviewed the Smith case the preceding evening and had determined that the Defendant's circumstances were different than those present in Smith. The Defendant's attorneys asserted that, unlike the situation in Smith, their prior comments to the trial court regarding the Defendant's competency, together with the Defendant's own statements as to why he wished to waive mitigation and the opinions of the experts defense counsel had obtained prior to trial, sufficiently called into question the Defendant's competence to waive mitigation such that the trial court should order a new competency evaluation of the Defendant. Defense counsel also continued to express to the trial court the difficulty they were having in representing the Defendant effectively given his decision to waive the presentation of mitigating evidence based upon his perception of the conduct of the proceedings up to that point.

During the course of these discussions, defense counsel announced to the trial court that the Defendant had changed his mind and now wished to put on some mitigating evidence as long as it did not pertain to his mental health. Defense counsel advised the trial court that the change in the Defendant's position was a result of his mother having passed him a note. Counsel asserted this was further evidence of the Defendant not being competent to make his own decisions about the presentation of evidence on his own behalf. After the Defendant attempted to speak and the trial court advised him to speak only through counsel, defense counsel stated that the Defendant had instructed them to advise the trial court that "he knows what we, his lawyers are doing, and that the medical evidence is irrelevant, and that he does not want it done."

The trial court advised defense counsel that the Defendant seeking advice from a family member about what to do was not unusual and the court did not view that as calling into question the Defendant's competence to waive mitigation. Defense counsel did not disagree, but merely emphasized that the Defendant appeared not to be making a "free choice" about what evidence to present at sentencing. The Defendant responded:

> My mother gives me advice as well. My family works together.
> Like I say, my family is on my side. Everybody that's back there is on my side. Like I said, I'm not stupid. I make — I make choices on my own. But at the same time they know as well as I know it's a whole lot more going on that's not said as far as [defense counsel] and my stepfather almost getting in a fight and everybody. We know all this. We — we've seen it, so we've been here.
> So as far as you getting on the stand and try to make everybody in my

family look bad, look crazy, like they're planning on doing, I'm not going to allow that.

Thank you very much.

My family's not crazy. We're not stupid at all.

The trial court then emphasized to the Defendant that he was entitled to court-appointed counsel as a matter of law, but that he was the "captain" of his own case and could pursue whatever strategy and choose whatever evidence he wished to present to the jury regardless of what his lawyers wanted to do. The trial court explained to the Defendant that the extensive questioning of him regarding his decision was to protect his rights and to ensure that his decision now to not present any mental health mitigation was made knowingly and voluntarily. The Defendant responded that the "captain requests mitigation factors," but "[t]he captain does not want no mental or — or no doctors, psychologist, psychiatrist, everything." The Defendant stated: "I want my family and everybody else that he plans on bringing up; you can go ahead and present that. I do not want no doctors, what I'm asking you. And what I'm — what I'm telling you and letting you know." The Defendant explained to the trial court that he felt his attorneys had "tricked" him when they said that they were going to work his case and that the story of what really happened had not been presented to the jury because both defense counsel and the trial court had not allowed it to be presented. At that point, the trial court elicited from the Defendant again that he did not want any mental health mitigation presented because, as the Defendant put it, it was "irrelevant." Instead, the Defendant stated he wanted only "character witnesses so we can go on with mitigation." The Defendant further stated:

What I am saying, I'm going to say this one time and that's the last. I'm not — I'm not going to ask anymore questions [sic]. I'm not going to answer no more questions.

I will allow mitigation. I do not want doctors. I want my family to come on as character witnesses. And that's as clear as I can put it. And I'm not going to keep playing games.

In making some preliminary findings regarding the Defendant's asserted waiver of his right to present mental health mitigation, the trial court noted that the Smith case made clear that a competent Defendant can waive the right to present mitigation evidence at sentencing. The trial court also noted that there had been no motion for a competency evaluation by the defense during the entire course of the trial until the Defendant advised defense counsel that he did not wish to present mental health mitigation. The trial court further observed that throughout the trial the Defendant had appeared to have cooperated with his attorneys and been able to discuss issues with his counsel as they arose, including during jury selection. The trial court stated that based upon the results of his independent questioning of the

Defendant, he appeared to be competent to waive the presentation of mental health mitigation. However, after discussing at length the case law regarding competence to stand trial, the trial court announced that it would review in camera the sealed reports previously submitted by the parties from their mental health experts before determining whether the Defendant's waiver of mental health mitigation could be accepted. The trial court also directed the parties' mental health experts—Dr. Steven Lawhon, a clinical psychologist retained by the State, and Dr. William Bernet, a forensic psychiatrist from Vanderbilt University retained by the defense—to conduct a joint competency evaluation of the Defendant during the lunch break while the trial court reviewed the previously submitted sealed reports from these experts.

Following the lunch break, the trial court inquired of both experts outside the presence of the jury regarding the results of their joint evaluation of the Defendant. The parties stipulated to the qualifications of both experts for the purpose of their testimony concerning their opinions regarding the Defendant's competence to make the decision to waive mental health mitigation.

Dr. Bernet testified that both he and Dr. Lawhon attempted to conduct an evaluation of the Defendant during the lunch break, but that the Defendant refused to cooperate. Dr. Bernet stated that the Defendant's refusal to cooperate made a competency evaluation impossible. However, Dr. Bernet remarked that he was able to make some general observations of the Defendant that seemed to indicate that he was competent to make the decision to waive the presentation of mental health mitigation. Dr. Bernet explained that the Defendant knew the names of both doctors, knew why they were there, and knew why the three of them were talking during the lunch break. The Defendant also was able to articulate that he was perfectly willing to have mitigation in the form of testimony from his family members presented, but that he did not want any medical or psychiatric witnesses presented as mitigation. Dr. Bernet also observed that the Defendant exhibited a "paranoid quality" to his refusal to cooperate and kept referencing that the entire proceeding "was just a game." Dr. Bernet concluded by stating that all he could really say was that there were "certain things that appeared to be in the direction of competence and there [were] other things that appeared to be in the direction of having some sort of underlying thought or mental disorder."

Dr. Lawhon described his observations of the Defendant during the attempted evaluation as follows:

Obviously the time we spent with Mr. Johnson was fairly brief. Not at our choosing, but because of his choosing.

Mr. Johnson's a very intelligent man. He was very rational, very

interesting. He did remember my name. It's been about two months since I've seen him. And Dr. [Bernet's] name. It's been several months; in 2006. And so he clearly knew who we were.

He knew the purpose of what our evaluation was. It was to look at his competence and to look at the mitigating circumstances in this case. He knew what mitigating circumstances were.

Like Dr. [Bernet] testified, he was comfortable having his mother and family and other perhaps character witnesses testify as to those mitigating circumstances, but much less comfortable with any mental health or psychiatric or psychological testimony. He did not explain why about that.

He was very alert. He kind of talked in a fast and rapid manner, but seemed to actually be somewhat unusually happy for the circumstances that we found him in.

He was somewhat suspicious and guarded. He was cordial toward both of us, and pleasant. He was a little bit we would describe as being emotionally labile. In other words, something happens and it's kind of like being upset, although he wasn't upset. But it's kind of like when you're with someone, say they're — you know, maybe your boss or somebody, and you kind of have to walk on tiptoes because you know that they maybe have a — have a bad temper or having a bad day, whatever. So he was kind of — kind of like in that kind of frame of mind. But he clearly knew why he was here.

It was difficult in the time frame to reach a definitive conclusion. He certainly displayed some evidence that he might be competent; but on the other hand, as Dr. [Bernet] testified, he was suspicious, guarded. And if we had a little more time I think we could have reached a conclusion. But based — because it was so short I think we would be unfair to the Defendant if we tried to reach a conclusion at this time.

In the sealed report prepared by Dr. Bernet following his evaluation of the Defendant on September 12, 2006, and submitted by the defense prior to trial, Dr. Bernet opined that the Defendant suffers from schizophrenia, paranoid type with interepisode residual symptoms, along with antisocial personality traits. Dr. Bernet opined that the Defendant "understood the nature of the charges against him, the possible outcomes of the trial, and basic court procedures." Dr. Bernet further opined that while the Defendant was suspicious of his court-appointed attorneys, "he was able to cooperate with them in developing a defense." Therefore, Dr. Bernet concluded in his report that the Defendant was competent to stand trial. Dr. Bernet based his conclusions on both his own interview of the Defendant and the results of psychological and neuropsychological testing conducted by Dr. James S. Walker, Ph.D., a professor of psychology at Vanderbilt University. Dr. Walker's report of his evaluation of the Defendant, which accompanied Dr. Bernet's, concluded that the

Defendant's "neuropsychological test results reflected essentially normal cognitive function" with his intelligence measuring "within the average range." Dr. Walker further opined in his written report that the Defendant was "able to understand, reason, and reflect about as well as the average person" and that his psychological test results "by themselves do not raise any serious questions about the [Defendant's] understanding of his legal situation, his ability to understand his rights, or his ability to cooperate [in] his own defense." Dr. Bernet indicated in his report that he also had reviewed the Defendant's medical records from a juvenile psychological evaluation in 1993, a brief inpatient psychiatric commitment in 1996 at Woodridge Hospital in Johnson City, and a pretrial mental health evaluation conducted at Middle Tennessee Mental Health Institute ("MTMHI") during the course of this case. Dr. Bernet finally stated that he had considered the Defendant's general medical history, family and work history, and educational background in reaching his conclusions.

In the sealed report prepared by Dr. Lawhon following his pretrial evaluation of the Defendant on January 25, 2007, and submitted by the State to the trial court on April 3, 2007, Dr. Lawhon opined that the Defendant suffers from bipolar disorder, mixed type without psychosis, along with alcohol and drug abuse and an antisocial personality disorder. Dr. Lawhon further opined that the Defendant "is an angry, narcissistic individual who cares little for the rights of others." Dr. Lawhon concluded that the Defendant was "aware of the roles of the judge, jury, district attorney, defense attorney and other court officials" and was "able to participate with his attorney in a defense in a rational manner." Dr. Lawhon based his conclusions on both his own interview of the Defendant and the results of various standardized psychological assessment tests administered to the Defendant. Dr. Lawhon also reviewed the Defendant's medical records from the pretrial mental health evaluation conducted at MTMHI as well as the records from Dr. Bernet's evaluation of the Defendant. Finally, Dr. Lawhon considered the Defendant's background, family and work history, and prior juvenile and adult criminal records in reaching his conclusions.

Based upon the testimony presented by Drs. Bernet and Lawhon, as well as a review of the sealed reports submitted pretrial by these experts, the trial court concluded that the Defendant was competent to waive the presentation of mental health mitigation. The trial court made clear that while the testimony and reports of both experts had been considered in reaching this conclusion, the court found Dr. Lawhon's testimony to be more "descriptive and credible." The trial court also made clear that defense counsel had "conducted extensive investigation" in this case and had "continued to investigate up until just before trial."[12] The

---

[12]Upon request of defense counsel, the trial court also allowed counsel to proffer to the court at the conclusion of the proof at the sentencing hearing a sealed composite exhibit consisting of the reports from Drs. Bernet, Lawhon and Walker reviewed by the trial court in making its determination regarding the
(continued...)

trial court directed that all mental health experts retained by the parties would remain under subpoena and available to testify until the close of the defense case at sentencing in the event the Defendant changed his mind regarding the presentation of mental health mitigation. The trial court also confirmed with the Defendant outside the presence of the jury both at the conclusion of the State's proof and at the conclusion of the proof presented by the defense at sentencing that the Defendant was adhering to his prior waiver of any mental health mitigation.

Clearly, the record in this case demonstrates that the trial court fulfilled its obligations under Zagorski and Smith to ensure that the Defendant was competent and fully understood his rights and the likely detrimental consequences of waiving those rights before he accepted the Defendant's decision to waive the presentation of mental health mitigation at sentencing. We note that this is not a case like either Zagorski or Smith in which the Defendant refused to present any mitigating evidence. This case involves a defendant who chose what mitigating evidence he wanted to present. The trial court painstakingly inquired of both the Defendant and defense counsel regarding the mitigation investigation conducted by counsel prior to trial, the specific evidence the Defendant did not want presented in mitigation at sentencing, and the Defendant's understanding of the risks of not presenting the mental health evidence counsel wished to present. The trial court also directed that the parties' mental health experts attempt to conduct a competency evaluation of the Defendant during the proceedings to determine whether his waiver of mental health mitigation could be accepted. Even though the Defendant refused to cooperate with this evaluation, the trial court specifically considered the pretrial reports submitted by the experts under seal prior to trial in determining the Defendant's competence to waive mental health mitigation in this case. The substance of these reports supports the trial court's conclusion that the Defendant was competent when he decided to waive the presentation of mental health mitigation at sentencing. Accordingly, there was no error in the acceptance of the Defendant's waiver of mental health mitigation and this issue is without merit.

*VI. Individual and Cumulative Instances of Alleged Prosecutorial Misconduct During Penalty Phase Closing Argument*

The Defendant argues that the prosecutor made two remarks during his penalty phase

---

[12](...continued)
Defendant's waiver of mental health mitigation as well as another written report prepared by Rebecca Smith, a psychiatric social worker, in connection with the Defendant's pretrial evaluation at MTMHI, which report the trial court conceded it did not directly consider in making its determination regarding the Defendant's competence to waive mental health mitigation. Defense counsel announced that this proffer consisted of the proof they would have presented had they been allowed to present mental health mitigation at sentencing.

closing argument that both individually and cumulatively denied the Defendant a fair trial. Specifically, the Defendant asserts that the prosecutor improperly asked the jury to consider in rendering its sentencing verdict the fact that the Defendant attempted to induce B.M. to have an abortion upon learning that she was pregnant and that the Defendant was the father. The Defendant also asserts that the prosecutor improperly commented on the Defendant's right not to testify when he asked the jury to consider the Defendant's lack of remorse for the killing of Officer Vance. The Defendant asserts that he moved for a mistrial after the prosecutor's second remark and that the trial court erred in denying said motion. The State contends that the trial court properly denied defense counsel's motion for a mistrial because: (a) appropriate curative and cautionary instructions were given after both of the challenged remarks; (b) the second remark was not an improper comment on the Defendant's right not to testify; and (c) the evidence presented in support of the aggravating factors at sentencing was so overwhelming that the prosecutor's remarks both individually and cumulatively could not have affected the sentencing verdict.

During defense counsel's closing, he argued that "anyone would have to concede" that the testimony presented at sentencing from the mothers of the Defendant's two sons established as a mitigating circumstance that the Defendant was "a loving father" to his children. In response to this argument, the prosecutor stated during his rebuttal closing argument at sentencing:

Do any of you think this man is a positive role model for anyone? Much less two small children.

He is an inspirational father. What is this man going to inspire his children to do? And in regards to that I would point out to you that the man who you saw the photograph of attending the birth of the one child is also the same man who wanted to abort what turned out to be his three daughters.[13]

Defense counsel immediately objected to this remark and the trial court sustained the objection. The trial court then instructed the jury to "disregard any comment about abortion." Upon continuing his argument, the prosecutor remarked:

[Defense counsel] says that you should give [the Defendant's] children an opportunity to visit this man in the penitentiary. Mark Vance's daughter only has the opportunity to visit her father in a cemetary.

And one thing I would ask you to ask yourselves when you're back there deliberating during the course of this trial have you heard the first word

_____

[13]B.M. had testified at trial that her pregnancy by the Defendant had resulted in her giving birth to triplets.

of remorse?

Defense counsel again immediately objected and the trial court directed the attorneys to approach the bench.

During the bench conference, defense counsel moved for a mistrial on grounds that the prosecutor's question to the jury about the Defendant's lack of remorse constituted improper comment on the Defendant's right to remain silent because the Defendant did not testify during the penalty phase. Defense counsel also argued in support of his motion that the prosecutor's abortion comment was not proper rebuttal to anything stated in defense counsel's closing and therefore the comment was improper. At that point, the trial court determined that a jury-out hearing needed to be conducted on the motion for mistrial. The jury then was taken from the courtroom after being advised that a matter needed to be taken up outside their presence.

During the jury-out hearing, defense counsel restated his grounds for the motion for mistrial previously stated at the bench conference and added as an additional ground the cumulative effect of both remarks made by the prosecutor and objected to by counsel. The prosecutor argued first that his remark about the Defendant wanting B.M. to have an abortion was a fair comment on the evidence in rebuttal to defense counsel's argument concerning the Defendant being a loving father. The trial court agreed that there had been evidence presented at trial concerning the Defendant wanting B.M. to have an abortion, but the trial court ruled that the prosecutor's comment on that evidence was not proper rebuttal to defense counsel's argument that the Defendant was a loving father. The trial court explained that the Defendant wanting B.M. to have a legal abortion did not call into question the credibility of the testimony presented to the effect that he was a loving father to the children he had already. The trial court also stated that the objection to the remark was sustained and the jury was instructed to disregard it because allowing the jury to consider such a remark would only inject into the deliberations issues about the legality and morality of abortion that were not relevant in this case. The trial court next addressed the prosecutor's statement concerning the Defendant's lack of remorse and ruled that the remark did not constitute an improper comment on the Defendant's right not to testify. Based upon the conclusion that the jury would be required to disregard the prosecutor's abortion remark in accordance with the curative instruction given and the determination that the lack of remorse comment was not improper, the trial court determined that there was no basis upon which to grant a mistrial as requested by the defense. However, the trial court stated that it would give the jury a cautionary instruction both at the conclusion of the jury-out hearing and during the general charge to the effect that they should not consider for any purpose, or draw any inference from, the fact that the Defendant did not testify in his own behalf.

The jury then returned to the courtroom at which point the trial court cautioned the jury that "the Defendant [was] not required to take the stand in his own behalf" and that "his election not to do so cannot be considered for . . . any purpose against him, nor can any inference be drawn from such fact." After the conclusion of closing arguments, the trial court again cautioned the jury during the final instructions to draw no adverse inference from the Defendant's failure to testify:

> The Defendant has not taken the stand to testify as a witness but you shall place no significance on this fact. . . . He is not required to take the stand in his own behalf, and his election not to do so cannot be considered for any purpose against him, nor can any inference be drawn from such fact.

Tennessee courts have long recognized that "closing argument is a valuable privilege for both the State and the defense and have allowed wide latitude to counsel in arguing their cases to the jury." State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998); State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). However, arguments "must be temperate, predicated on evidence introduced during trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999); Goltz, 111 S.W.3d at 5. Trial judges are accorded wide discretion in their control of closing argument and the exercise of that discretion will not be disturbed on appeal absent a showing of abuse thereof. Cauthern, 967 S.W.2d at 737; State v. Ward, 138 S.W.3d 245, 277-78 (Tenn. Crim. App. 2003); Goltz, 111 S.W.3d at 5. In determining whether the challenged remarks by the prosecutor in this case were improper, this court is guided by the following five principles: (1) it is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw; (2) it is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) the prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury; (4) the prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict; and (5) it is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge. Goltz, 111 S.W.3d at 6.

If it is determined that the prosecutor engaged in misconduct during closing argument by making improper remarks to the jury, then this court must evaluate whether the improper comments were so improper or inflammatory as to have affected the verdict to the detriment of the Defendant. See State v. Reid, 164 S.W.3d 286, 344 (Tenn. 2005); Cauthern, 967 S.W.2d at 737; Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); Ward, 138 S.W.3d

at 278; Goltz, 111 S.W.3d at 5; State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). In doing so, the court considers the following factors set forth in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), and adopted by the supreme court in State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984): (1) the conduct complained of, viewed in light of the facts and circumstances of the case, (2) the curative measures undertaken by the court and the prosecutor, (3) the intent of the prosecutor in making the improper statement, (4) the cumulative effect of the improper conduct and any other errors in the record, and (5) the relative strength or weakness of the case. See Cauthern, 967 S.W.2d at 737; Ward, 138 S.W.3d at 278; Goltz, 111 S.W.3d at 5-6; Zirkle, 910 S.W.2d at 888.

Considering the prosecutor's lack of remorse comment first, the evidence presented during the guilt phase showed that the Defendant had expressed no remorse for having shot Officer Vance either when he stated to Lieutenant Senter that he "shot the fucking cop" or when he made his statements about having shot Officer Vance while seated in the back of Officer Graham's patrol unit. As the trial court instructed at the conclusion of the State's proof at sentencing, the jury could consider the evidence it heard during the guilt phase when reaching its sentencing verdict. See Tenn. Code Ann. § 39-13-204(e)(1) (2006). As such, we conclude that the prosecutor's lack of remorse comment was a fair comment on the evidence presented and not an improper attack on the Defendant's right not to testify. Cf. State v. Ward, 138 S.W.3d 245, 279 (Tenn. Crim. App. 2003) (determining that prosecutor's comment that defendant had failed to offer an explanation supporting his accidental death theory was not an improper comment on the defendant's decision not to testify where the proof at trial showed that the defendant had not given an explanation for the victim's death to paramedics, a social work at the hospital, or the detective who took two statements from the defendant). Moreover, the trial court appropriately instructed the jury both immediately after the lack of remorse remark and during the final penalty phase instructions that the Defendant had a right not to testify and that the jury should draw no inference adverse to him from his failure to take the stand. Because the jury is presumed to have followed the trial court's instructions, see State v. Keen, 31 S.W.3d 196, 232 (Tenn. 2002) (appendix); State v. Lawson, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985), any impropriety in the prosecutor's lack of remorse comment could not have prejudicially affected the jury's consideration of the evidence such that a mistrial was required.

With regard to the prosecutor's abortion remark, we agree with the trial court's conclusion that the prosecutor's rebuttal closing argument on this point was calculated to inflame the passions and prejudices of the jury and injected into the penalty phase an issue broader than the question of the appropriate sentence for the Defendant's crime. While the prosecutor's argument was based upon the abortion evidence presented during the guilt phase that was relevant to the Defendant's motive for the murder of Officer Vance, it is clear that the prosecutor's comment upon that evidence during his sentencing phase rebuttal closing

argument was designed to evoke in the jury an emotional response to the morality of abortion in general and the morality of the Defendant in particular. We agree with the trial court that the prosecutor's remark injected into the jury's deliberations issues about the legality and morality of abortion that had no bearing on the sentencing outcome of this case. Nevertheless, because the trial court sustained defense counsel's objection to the remark and instructed the jury to "disregard any comment about abortion" immediately after the challenged remark was made, the prosecutor's abortion remark could not have prejudicially affected the jury's consideration of the evidence such that a mistrial was required. As previously noted, the jury is presumed to have followed the trial court's instructions. See Keen, 31 S.W.3d at 232; Lawson, 695 S.W.2d at 204.

As a result, and considering the evidence presented in this case as well as the cautionary and curative instructions given by the trial court, we agree with the State that the prosecutor's challenged remarks during his sentencing phase closing argument did not require the trial court to grant a mistrial when considered either individually or cumulatively. Accordingly, this issue is without merit.

### VII. Denial of Special Jury Instructions During Penalty Phase

The Defendant argues that the trial court erred in denying his request that two special jury instructions be given during the general penalty phase instructions. Specifically, after the prosecutor finished his rebuttal closing argument at sentencing, defense counsel requested during a jury-out hearing that the jury be given two special instructions in response to the prosecutor's lack of remorse comment during closing. The substance of the requested special instructions were as follows:

Defendant's Requested Jury Instruction #1. In your consideration of aggravating factors you are limited to the two statutory aggravating factors previously enumerated. Specifically I charge you that lack of remorse may not be considered by you as an aggravating factor.

Defendant's Requested Jury Instruction #2. I further charge you that the Defendant still retains the right to remain silent, and his failure to express remorse may not be considered by you in your consideration of the proper punishment.

The prosecutor responded to defense counsel's request by asserting that he never argued that lack of remorse could be considered as an aggravating circumstance. However, the prosecutor argued that it would be permissible for the jury to consider the Defendant's lack of remorse when weighing the aggravating and mitigating circumstances.

The trial court denied defense counsel's request for the two special instructions on grounds that: (a) the standard jury instructions already limited the jury to considering only the two statutory aggravating circumstances relied upon by the State; and (b) the standard jury instruction on the Defendant's right to remain silent, which the trial court intended to give during the penalty phase charge, already advised the jury that it could not consider the Defendant's failure to testify in making its penalty phase decision. As part of his final instructions at sentencing, the trial court advised the jury that no sentence of death or sentence of life imprisonment without the possibility of parole could be imposed by them unless the State had proven beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances relied upon by the State at sentencing, namely: (1) that the Defendant previously had been convicted of one or more felonies whose statutory elements involved the use of violence to the person; and (2) that the Defendant knew or reasonably should have known when he committed the murder that the victim was a law enforcement officer engaged in the performance of his official duties. The trial court then gave the following limiting instruction to the jury: "You shall not consider any other facts or circumstances as an aggravating circumstance in deciding whether the death penalty or imprisonment for life without the possibility of parole would be the appropriate punishment in this case." And, as previously noted, the trial court also instructed the jury as follows regarding the Defendant's failure to testify on his own behalf:

> The Defendant has not taken the stand to testify as a witness but you shall place no significance on this fact. . . . He is not required to take the stand in his own behalf, and his election not to do so cannot be considered for any purpose against him, nor can any inference be drawn from such fact.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011) (citing State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005), State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001), and State v. Garrison, 40 S.W.3d 416, 432 (Tenn. 2000)); State v. Trusty, 326 S.W.3d 582, 602 (Tenn. Crim. App. 2010). "The proper function of a special instruction is to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001). A trial court's refusal to grant a request for a special jury instruction is error only if the general charge fails to fully and fairly state the applicable law, considering the instructions in their entirety and as a whole. See Dorantes, 331 S.W.3d at 390; Cozart, 54 S.W.3d at 245; Trusty, 326 S.W.3d at 602.

The Defendant concedes in his argument on appeal that a trial court may decline to

give a requested special instruction if its substance already is covered by the standard instructions to be given to the jury. However, the Defendant argues that the instructions given were "woefully inadequate to address the improper comments by the prosecutor, particularly considering that this was a sentencing hearing in a capital case." The State contends that the special instructions requested by defense counsel were unnecessary because the instructions given by the trial court at the conclusion of the penalty phase adequately advised the jury concerning the Defendant's right to remain silent as well as what the jury could and could not consider as an aggravating circumstance.[14]

Upon review of the instructions given to the jury at the conclusion of the penalty phase, we agree with the State that the special instructions requested by defense counsel were unnecessary to a full and fair statement of the law applicable at sentencing. The trial court instructed that, in deciding whether the defendant could be sentenced to death, the jury could not consider as an aggravating circumstance anything other than the two statutory aggravating circumstances relied upon by the State. Consistent with the first special instruction requested by the Defendant, the trial court's instructions necessarily advised the jury that they could not consider lack of remorse as an aggravating factor. The trial court also instructed the jury that the Defendant's exercise of his right to remain silent and election not to testify in his own behalf at sentencing could not in any way be used against him. Again, consistent with the second special instruction requested by the Defendant, the trial court's instructions necessarily told the jury that the Defendant's failure to take the stand and express remorse could not be used against him in determining the appropriate punishment. Accordingly, the Defendant is not entitled to relief on this issue.

*VIII. Denial of Motion for Change of Venue*

The Defendant argues that the trial court erred in denying his oral motion for a change of venue made on the last day of jury selection. Defense counsel argue on appeal that the motion was made "after it became apparent [during jury selection] that pretrial publicity had influenced many potential juror[s]." However, defense counsel do not identify in their brief any juror who sat in judgment of the Defendant who was unduly influenced by pretrial publicity in this case. The State contends that the trial court did not abuse its discretion in denying the motion for a change of venue. The State also argues that the Defendant cannot obtain relief on this issue because he has failed to establish that any of the jurors who actually sat on the jury in this case were prejudiced against the Defendant as a result of pretrial

---

[14]The State also argues that this issue is waived because the Defendant failed to support this issue with references to the record and citation to authority. However, the lack of record references and citation to authority in support of this issue were cured in the amended principal brief filed by defense counsel, at this court's direction, after the State filed its responsive brief.

publicity.[15]

Article I, section 9 of the Tennessee Constitution provides a criminal defendant with the right to trial "by an impartial jury of the county in which the crime shall have been committed." As a result, a defendant must be prosecuted in the county where his or her offense was committed unless the trial court changes venue on motion of the defendant or with the defendant's consent. See Tenn. R. Crim. P. 18(a); Tenn. R. Crim. P. 21(a). A trial court may change venue upon motion or with the consent of the defendant "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a); see also State v. Davidson, 121 S.W.3d 600, 611 (Tenn. 2003). It is within the trial court's discretion whether to grant a motion for a change of venue and this court will not overturn the denial of such a motion absent a showing that the trial court has abused its discretion. See, e.g., Davidson, 121 S.W.3d at 611-12; State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993).

In determining whether the trial court abused its discretion in denying the Defendant's motion for a change of venue, this court must bear in mind that mere exposure of a juror to pretrial publicity does not by itself warrant a change in venue. See, e.g., State v. Thacker, 164 S.W.3d 208, 238 (Tenn. 2005) (appendix); Davidson, 121 S.W.3d at 611 (citing State v. Mann, 959 S.W.2d 503, 532 (Tenn. 1997)). Jurors need not be totally ignorant of the facts and issues involved in a case upon which they are sitting; they need only be able to lay aside their opinions or impressions and render a verdict based upon the evidence presented. See Irvin v. Dowd, 366 U.S. 717, 723 (1961); Thacker, 164 S.W.3d at 238; State v. Pike, 978 S.W.2d 904, 924 (Tenn. 1998) (appendix); Mann, 959 S.W.2d at 531; State v. Bates, 804 S.W.2d 868, 877 (Tenn. 1991). The following factors set forth by this court in State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979), are relevant to the trial court's inquiry into whether exposure of the venire to pretrial publicity requires a change of venue: the nature, extent, and timing of pretrial publicity; the nature of the publicity as fair or

---

[15]The parties both state in their briefs that the trial court noted that the oral motion for a change of venue was not initially accompanied by affidavits alleging facts supporting the existence of any "undue excitement" against the Defendant as a basis for changing venue as required by Rule 21(b) of the Rules of Criminal Procedure. The Defendant notes in his brief that this deficiency was cured by defense counsel submitting to the trial court just prior to its ruling a handwritten affidavit attesting to the fact that the trial court's recitation of the facts immediately prior to the submission of the affidavit were correct to the best of counsel's knowledge and belief. Although the trial court announced that the handwritten affidavit would be entered into evidence for identification only, the affidavit does not appear among the exhibits transmitted with the record in this appeal. Because the trial court did not base its denial of the motion for a change of venue upon the lack of supporting affidavits, we decline to comment on whether defense counsel's handwritten affidavit constituted compliance with Rule 21(b) of the Rules of Criminal Procedure, particularly given that the actual affidavit does not appear in this record.

inflammatory; the particular content of the publicity; the degree to which the publicity complained of has permeated the area from which the venire is drawn; the degree to which the publicity circulated outside the area from which the venire is drawn; the time elapsed from the release of the publicity until the trial; the degree of care exercised in the selection of the jury; the ease or difficulty in selecting the jury; the familiarity of the venire with the publicity and its effect, if any, upon them as shown through their answers on voir dire; the defendant's utilization of his peremptory challenges; the defendant's utilization of his challenges for cause; the participation by police or by the prosecution in the release of publicity; the severity of the offense charged; the absence or presence of threats, demonstrations or other hostility directed toward the defendant; the size of the area from which the venire is drawn; affidavits, hearsay, or opinion testimony of witnesses; and the nature of the verdict returned by the trial jury. See Davidson, 121 S.W.3d at 611; Howell, 868 S.W.2d at 249.

The relevant inquiry for our purposes is "'whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity.'" Thacker, 164 S.W.3d 208, 238 (Tenn. 2005) (appendix) (quoting State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989)). Prejudicial error will not be presumed on a mere showing that there was considerable pretrial publicity. See Dobbert v. Florida, 432 U.S. 282, 303 (1977); State v. Melson, 638 S.W.2d 342, 261 (Tenn. 1982). Thus, before this court will reverse a conviction based upon the trial court's failure to grant a change of venue, the burden is on the defendant to show that the jurors selected to hear and decide the case were biased or prejudiced against. See Thacker, 164 S.W.3d at 238.

In denying defense counsel's motion, the trial court specifically considered the factors set forth in Hoover and in so doing specifically found that individual voir dire had been granted to the attorneys in this case on the issue of pretrial publicity, that several of the prospective jurors who had been exposed to some pretrial publicity but "passed" individual voir dire on the publicity issue had been peremptorily challenged by counsel, that most of the prospective jurors' exposure to pretrial publicity had occurred over two and a half years ago when the offense occurred, that information about the crime to which the prospective jurors were exposed via pretrial publicity consisted primarily of the undisputed facts of the crime the State intended to present at trial, that there had been no sudden escalation in media coverage immediately prior to the start of the trial, that most of the prospective jurors had demonstrated through their responses to questioning that they had avoided all recent publicity in accordance with the instructions given to them with their summonses and throughout the jury selection process, and that there had been no evidence presented of "emotion running wild in the community" concerning this case or this defendant (Tr. X: 1419-1426, 1430-1431). Based upon these findings, the trial court concluded that the Defendant could receive a fair trial in the county where the crime occurred and denied defense counsel's motion for

a change in venue (Tr. X: 1431).

The record of the extensive jury selection proceedings in this case supports the findings made by the trial court in support of the denial of the oral motion for a change of venue. While the record demonstrates that many prospective jurors knew about the facts surrounding the crime from having viewed television news accounts or having read newspaper articles on the case prior to having been called for jury duty, the record does not disclose and the Defendant has failed to argue in his brief that any of the jurors who actually sat and rendered verdicts in this case were prejudiced against the Defendant as a result of the pretrial publicity given to the crime by the media. Accordingly, the Defendant is not entitled to relief on this issue. See Pike, 978 S.W.2d at 924 (affirming denial of motion for change of venue where "every juror who said he or she was familiar with the case said that he or she could disregard the reports and render an impartial decision," "[a]ll potential jurors who said they could not disregard the reports were excused for cause, and the defendant "ha[d] cited no specific response from any seated juror that was troublesome").

*IX.  Denial of Ex Parte Request for Expert Funds to Conduct Community Polling*

The Defendant next argues that the trial court erred in denying his *ex parte* motion for authorization of funds to employ an expert to conduct polling in the community to gauge the effect of pretrial publicity on the prospective jury pool. The Defendant asserts that the denial of this motion prevented the defense from gathering and presenting to the trial court relevant evidence in support of the defense motion for a change of venue. The State asserts that the Defendant did not establish the "particularized need" required for the appointment of an expert to conduct the requested community polling because such polling does not require the services of an expert.[16]

A capital defendant who has been declared indigent by the trial court may seek, through *ex parte* proceedings, authorization for state funds to be used for investigative or expert services "necessary to ensure that the constitutional rights of the defendant are properly protected." Tenn. Code Ann. § 40-14-207(b) (2006). However, "the right to assistance of state paid experts exists only upon a showing of particularized need." State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992); see also State v. Dellinger, 79 S.W.3d 458, 469

---

[16]The State also argues that this issue is waived because the Defendant failed to provide an adequate record for this court's review of this issue. At the time the State filed its responsive brief, the record did not contain either the *ex parte* motion for expert services or the trial court's order denying the motion. By order entered after the filing of the State's brief, this court granted defense counsel's motion to supplement the record with both the *ex parte* motion and the trial court's order denying the motion. Thus, the deficiency in the record relied on by the State in support of its waiver argument has been cured.

(Tenn. 2002). That is, "[t]he defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that his defense cannot be fully developed without such professional assistance." Id. Whether the defendant has shown a "particularized need" for the requested services rests within the sound discretion of the trial court and such a decision will not be disturbed on appeal absent a showing of an abuse of discretion. See Tenn. Code Ann. § 40-14-207(b) (2006); Dellinger, 79 S.W.3d at 469; State v. Cazes, 875 S.W.2d 253, 261 (Tenn. 1994); Evans, 838 S.W.2d at 192.

In order to demonstrate on appeal that the trial court abused its discretion in denying an *ex parte* request for investigative or expert assistance, a capital defendant must show that the denial of the requested services prevented him from receiving a fair trial. See Dellinger, 79 S.W.3d at 469; State v. Black, 815 S.W.2d 166, 179-180 (Tenn. 1991). As noted in the analysis of the Defendant's issue concerning the denial of his motion for a change of venue, the Defendant has failed in this appeal to demonstrate that any of the jurors who actually sat and rendered verdicts in this case were prejudiced against him as a result of the pretrial publicity given to the crime by the media. Accordingly, because the Defendant cannot demonstrate that the denial of his *ex parte* request for expert funds to conduct community polling deprived him of a jury free from bias or prejudiced resulting from pretrial publicity, the Defendant is not entitled to relief on this issue.

*X. Denial of Request for Additional Peremptory Challenges*

The Defendant finally argues that the trial court erred in denying his oral motion for additional peremptory challenges made on the last day of jury selection. The State contends that this issue is without merit because the trial court provided this capital defendant with all of the peremptory challenges to which he was entitled pursuant to Rule 24 of the Rules of Criminal Procedure.[17]

In his argument in support of this issue, the Defendant acknowledges that the supreme court's opinion in State v. Davidson, 121 S.W.3d 600 (Tenn. 2003), which the trial court relied on in denying the motion, "does not recognize the authority of a trial court to grant additional peremptory challenges," but the Defendant presents this issue on appeal "as a good

---

[17]The State also argues that the Defendant waived consideration of this issue by failing to support his argument with references to the record, citation to authority or argument. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). However, this argument was made in response to defense counsel's initial principal brief which did suffer from the deficiencies noted by the State. The defects prompting the State's waiver argument were cured in the amended principal brief filed by defense counsel, at this court's direction, after the State filed its responsive brief. While the argument presented in the amended principal brief in support of this issue is sparse, it appears sufficient to overcome the State's waiver argument.

faith argument for a change of the law." The Defendant further argues that in cases like this one, "involving a potential change of venue, it is in the interest of justice to permit additional challenges if the court believes that this could avoid a change of venue and the consequent expense and delay and unnecessary claims on the time of jurors."

In <u>Davidson</u>, the defendant argued that the trial court erred in denying his motion for additional peremptory challenges and that the error was prejudicial because it allowed two individuals defense counsel believed were objectionable to participate as jurors in the case. <u>See id.</u> at 613 n.6. Noting that the defendant had not claimed that he was denied the number of peremptory challenges permitted to a capital defendant by Rule 24, the supreme court provided the defendant with no relief on this issue. <u>See id.</u> Similarly, the record discloses that the Defendant in this case was provided with all fifteen of the peremptory challenges to which a capital defendant is entitled, plus three additional peremptory challenges for each alternate juror selected, for a total of eighteen peremptory challenges. <u>See</u> Tenn. R. Crim. P. 24(e)(1), (4). The record also discloses that the Defendant exhausted all eighteen of his peremptory challenges during the selection of the jury in this case. The only grounds argued to the trial court by defense counsel in support of his request for additional peremptory challenges were that the jury selection process had been "long" and "difficult" as a result of the pretrial publicity surrounding the case (Tr. X: 1445). However, defense counsel never identified to the trial court and has not identified to this court any particular objectionable juror who sat in judgment of the Defendant as a result of the denial of the defense motion for additional peremptory challenges.

As the supreme court explained in <u>State v. Howell</u>, 868 S.W.2d 238, 248 (Tenn. 1993):

> It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury, <u>see</u> <u>Wainwright v. Witt</u>, 469 U. S. 412, 105 S. Ct. 844, 83 L.Ed.2d 841 (1985), and the use of peremptory challenges is a means to achieve the end of an impartial jury. <u>Ross v. Oklahoma</u>, 487 U. S. 81, 88, 108 S. Ct. 2273, 2278, 101 L.Ed.2d 80 (1988). However, although the right to exercise peremptory challenges is "one of the most important of the rights secured to the accused," <u>Swain v. Alabama</u>, 380 U. S. 202, 219, 85 S. Ct. 824, 835, 13 L.Ed.2d 759 (1965), the right to exercise peremptory challenges is not of constitutional dimension. <u>Ross</u>, 487 U. S. at 88, 108 S. Ct. at 2278.
>
> As long as the jury that sits is impartial, the denial or impairment of the right to exercise peremptory challenges does not violate the Sixth Amendment. <u>Id.</u> In addition, because peremptory challenges are a creature of statute and are not required by the Constitution, denial or impairment of the right to exercise

peremptory challenges does not violate the due process clause of the Fourteenth Amendment as long as the defendant receives what the state law provides. Id., 487 U. S. at 89, 108 S. Ct. at 2279.

The supreme court noted in Howell that the capital defendant in that case "was permitted to exercise all 15 of the peremptory challenges a death-eligible defendant is allowed under Tenn. R. Crim. P. 24," and that "the record does not support a charge of systematic impairment of his ability to exercise those challenges." Id. The supreme court further stated in Howell that there was "no evidence that the jury which ultimately heard the case was unfair or partial." Id. The same is true in this case. Accordingly, we agree with the State that this issue has no merit.

## XI. Proportionality Review

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), this court is required to review the Defendant's sentence of death to determine whether: (A) it was imposed in an arbitrary fashion; (B) the evidence supports the jury's finding of aggravating circumstances supporting imposition of the sentence; (C) the evidence support's the jury's finding that the aggravating circumstances outweighed any mitigating circumstances; and (D) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. Tenn. Code Ann. § 39-13-206(c)(1).

### A. Arbitrariness

Constitutional concerns regarding the imposition of the death penalty arise when "'sentencing procedures . . . create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner.'" Zant v. Stephens, 462 U.S. 862, 910 (1983) (Marshall, J., dissenting) (quoting Godfrey v. Georgia, 446 U.S. 420, 427 (1980)). The United States Supreme Court has held that these concerns can be alleviated by "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." Gregg v. Georgia, 428 U.S. 153, 195 (1976). Tennessee's capital sentencing procedures have been upheld as satisfying these constitutional requirements. See, e.g., State v. Kiser, 284 S.W.3d 227, 271 (Tenn. 2009). Having thoroughly reviewed the evidence presented in the subject case, we conclude that the sentence of death was not imposed in an arbitrary fashion but rather in a manner consistent with the requirements of the death penalty statute.

### B. Sufficiency of Statutory Aggravating Circumstance Found by the Jury

The jury in this case found that the proof established the presence of the following two aggravating circumstances: (1) that the defendant previously had been convicted of one or

more felonies whose statutory elements involved the use of violence to a person; and (2) that the defendant knew or should have known when he committed the murder that the victim was a law enforcement officer engaged in the performance of his official duties. See Tenn. Code Ann. § 39-13-204(i)(2), (9) (2006). The evidence presented for the jury's consideration in this case was sufficient support the application of both aggravating circumstances found by the jury. The record of the Defendant's Virginia conviction for the crime of malicious wounding was sufficient to prove that the Defendant had a prior felony conviction involving the use of violence to a person. The evidence presented during the guilt phase also established that Officer Vance was a law enforcement officer engaged in the performance of his official duties when he was killed and that the Defendant was aware of Officer Vance's status as a law enforcement officer before he shot him in the face.

### C. Totality of Aggravating Factors Applied

After considering the evidence presented to the jury during both the guilt and sentencing phases, we conclude that the evidence supports the jury's finding that the two aggravating circumstances found to be present outweighed any mitigating circumstances presented by the defense beyond a reasonable doubt. The only mitigating evidence offered by the Defendant in this case was character testimony from family members, friends and the mothers of his children. Because it was within the province of the jury to assign whatever weight it deemed appropriate to the testimony presented, the jury was free to disregard the character testimony in its entirety or determine that the aggravating circumstances established by the evidence outweighed any mitigating effect present as a result of the character testimony presented at sentencing. As such, the evidence supports the jury's finding regarding the weighing of aggravating and mitigating circumstances in this case.

### D. Proportionality of Sentence

In engaging in the comparative proportionality review required by the statute, see Tenn. Code Ann. § 39-13-206(c)(1)(D), this court " 'presumes that the death penalty is not disproportionate to the crime in the traditional sense." State v. Bland, 958 S.W.2d 651, 662 (Tenn.1997) (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)). The relevant inquiry is whether the sentence of death is "'disproportionate to the punishment imposed on others convicted of the same crime.'" Id. The presumption of proportionality only applies if the focus is "on the particularized nature of the crime and the particularized characteristics of the individual defendant." McCleskey v. Kemp, 481 U.S. 279, 308 (1987) (quoting Gregg, 428 U.S. at 153, 206). Comparative proportionality review "is designed to identify aberrant, arbitrary, or capricious sentencing." State v. Stout, 46 S.W.3d 689, 706 (Tenn. 2001). This court "employs the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes. . . .

[A] death sentence is disproportionate if a case is 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.'" State v. Davis, 141 S.W.3d 600, 619-20 (Tenn. 2004) (quoting Bland, 958 S.W.2d at 668). "[T]he pool of cases considered . . . includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." Id. at 620.

Because "'the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.'" State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997) (quoting Gregg, 428 U.S. at 203). This court's proportionality review is neither a rigid nor an objective test. Hall, 958 S.W.2d at 699. There is no "mathematical formula or scientific grid," and we are not bound to consider only cases in which the same aggravating circumstances were found applicable by a jury. Id.; State v. Brimmer, 876 S.W.2d 75, 84 (Tenn.1994). In comparing this case to other cases in which defendants were convicted of the same or similar crimes, this court looks "at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved." McCleskey, 481 U.S. at 308 (quoting Gregg, 428 U.S. at 206). Although there is no specific formula for comparing similar cases, as no two defendants are exactly the same, this court generally considers the following factors involving the circumstances of the offense:

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

Davis, 141 S.W.3d at 619-20 (quoting Bland, 958 S.W.2d at 668). This court must also consider the following factors about the defendant: "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." Id. (citing Bland, 958 S.W.2d at 667; State v. Bane, 57 S.W.3d 411, 428-29 (Tenn. 2001)).

The evidence presented in this case clearly showed that the Defendant came to B.M.'s residence on the night of the crime armed with two weapons and ammunition. The Defendant was warned when he arrived that the police were on their way. Despite the pleas

of several witnesses to leave, the Defendant remained in the home waiting on either the police or B.M.'s father to arrive so that he could "shoot in the face" whoever arrived first. The statements made by the Defendant both before and after the shooting illustrate the premeditated nature of the crime. The Defendant shot in the face, at point blank range, a uniformed law enforcement officer engaged in the lawful performance of his duties for no reason other than the Defendant's desire to go to prison for murder and not for the statutory rape of B.M. The Defendant at no point expressed remorse for the senseless killing of Officer Vance. Given the premeditated nature of the crime and the Defendant's reason for committing the crime, as well as the fact that the Defendant committed this crime after having served a sentence for a prior violent felony, this court cannot conclude that the Defendant has any potential for rehabilitation. The supreme court has upheld death sentences under comparable circumstances where the jury has applied the (i)(9) aggravating circumstance.

In State v. Workman, 667 S.W.2d 44 (Tenn. 1984), a jury imposed a death sentence on a defendant who shot and killed a police officer following the defendant's robbery of a fast-food restaurant. The defendant was apprehended almost immediately after the robbery; however, he broke free from police custody and fired his gun at officers in an attempt to escape arrest. As a result, the defendant shot two officers, killing one of them. The jury found the presence of four aggravating circumstances, including the (i)(9) factor.

In State v. Henderson, 24 S.W.3d 307 (Tenn. 2000), the twenty-four-year-old defendant, in executing his plot to escape from jail, shot and killed a police deputy who was in charge of transporting the defendant to a dental appointment. At sentencing, the defendant testified on his own behalf and a forensic pathologist offered testimony based upon two sessions she conducted with the defendant. The pathologist opined that the defendant suffered from dissociative disorder and an unspecified personality disorder and concluded that the Defendant was acting under duress at the time of the shooting and his judgment was inadequate. The jury found the presence of four aggravating circumstances, but concluded that the aggravating circumstances outweighed any mitigating circumstances. The victim in Henderson, like the victim in the instant case, was a uniformed officer who did nothing to provoke the attack. Both defendants knew that their victims were law enforcement officers and premeditated their intent to kill. However, unlike the instant case where no mental mitigating evidence was offered by the Defendant, the jury in Henderson was presented with evidence concerning the mental health of the defendant at the time of the crime. Nonetheless, the jury in Henderson still imposed a death sentence and this court determined that the sentence imposed was not disproportionate.

In State v. Kiser, 284 S.W.3d 227, 239 (Tenn. 2009), the defendant received the death penalty for murdering a police officer he encountered while attempting to commit arson. The

defendant in that case drove someone else's vehicle to a nearby fruit stand late at night, wearing dark clothing and armed with an assault rifle. When the victim police officer pulled up in his patrol car, the defendant in Kiser waited until the officer was out of his vehicle and in the open before shooting him repeatedly with his assault rifle. Once the victim officer was down, the defendant in Kiser ripped a portion of the officer's bulletproof vest from his body and took his service weapon. The defendant used his friend's car without his permission to commit the crime and returned to the friend's home after the murder to dispose of the evidence he had gathered at the crime scene. The defendant gloated to others about killing the officer. The Defendant attempted to resist arrest and showed no remorse for his crimes. The jury in Kiser found the presence of the (i)(9) aggravating circumstance. Like the Defendant in this case, the defendant in Kiser declined to present any mitigating evidence at sentencing and, as a result, the jury concluded that any mitigating evidence was outweighed by the established aggravating circumstance. On appeal, the sentence of death was determined not to be disproportionate.

We recognize that some of the cases cited involved more than two aggravating circumstances, unlike the instant case. However, only one aggravating circumstance is required for the imposition of the death penalty. See, e.g., State v. Moore, 614 S.W.2d 348, 351-52 (Tenn. 1981). Additionally, while the statute "does not assign relative significance or wickedness to the various statutory aggravating circumstances," the supreme court has determined that "[b]y their very nature, and under the proof in certain cases, . . . some aggravating circumstances may be more qualitatively persuasive and objectively reliable than others." State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993). In Howell, it was determined that the prior violent felony aggravating circumstance was one of the "more qualitatively and objectively reliable" aggravating circumstances. Id. The proof in this case of both aggravating circumstances was also overwhelming. Accordingly, this court views this case as being appropriate for comparison with more highly aggravated cases, particularly given the relative weakness of the mitigating evidence presented

After reviewing these cases, and many others not specifically cited, we conclude that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes. In completing our review, it is not required that we conclude that the present case is exactly like the cited cases in every respect, nor that it is "more or less" like other death penalty cases. This court is only charged with identifying aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. See State v. Thomas, 158 S.W.3d 361, 383 (Tenn. 2005). The penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes in other similar cases.

## CONCLUSION

In accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions of the Supreme Court of Tennessee, we have considered the entire record in this case and conclude that the sentence of death was not imposed arbitrarily. The evidence supports the jury's finding of the (i)(2) and (i)(9) statutory aggravating circumstances as to the murder of the victim. Moreover, the evidence supports the jury's finding that the application of these enumerated aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-206(c)(1). A comparative proportionality review, considering the nature of the crime, the Defendant, and the aggravating and mitigating circumstances, convinces us that the sentence of death was neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, because our review of the record also demonstrates no reversible error as to the issues presented, we affirm the Defendant's conviction for first degree premeditated murder and his resulting sentence of death.

_____
D. KELLY THOMAS, JR., JUDGE